[No. 29955. Department One. August 28, 1947.]

H. T. ANTHONY et al., Respondents, v. HUBERT K. WARREN
et al., Respondents and Cross-appellants, C. ROGER DAY
et al., Appellants.[1]

[1]Reported in 184 P. (2d) 105.

774

*Pedigo, Watson & Gose* and *Robert J. Williams,* for appellants.

*Marvin Evans, Cameron Sherwood,* and *Albert N. Bradford,* for respondents and cross-appellants.

ROBINSON, J.—In this triangular controversy, the principal dispute is between the Warrens and the Days. In March, 1945, Mr. Warren, a retired farmer, then working as an apprentice in a Spokane bakery, became interested in a newspaper advertisement, which read as follows:

"No. 11B-C Tel Broad, 3645
Dinners, 75 cents to $1.35. Special parties. Labor about $34. a day, without proprietor working. About $4000 monthly receipts. This is hot at $5250. Let me tell you all about this. Half cash. You can also buy the property if you wish."

The real estate firm advertising this listing proved to be a partnership doing business as Elmendorf-Anthony Company, the plaintiff in this cause, hereinafter referred to as "the broker." From that company's representative, the Warrens learned that the restaurant involved was located in Walla Walla, at 214 Boyer avenue, and was known as "The Cabin," and that the proprietors were C. Roger Day and Glenna Day, his wife. The Warrens drove to Walla Walla on Saturday, March 17th, had dinner at "The Cabin," and talked with Mrs. Day. They were favorably impressed and asked to see the books. Mrs. Day said her husband had the books, but she knew that the cash register showed four thousand dollars a month gross income.

On Sunday, March 18th, Mr. Heineman, an employee of the Elmendorf-Anthony Company, arranged a meeting between the Warrens and C. Roger Day in a Spokane hotel. Mr. Day represented that thirty per cent of the gross receipts was profit, but that he had business elsewhere of such importance that, unless he could get rid of the restaurant at once, he might be forced to lock it up. He explained that he had just inherited a considerable amount of property located in the East. How much he did not say, but he did incidentally remark that he would have to pay an inheritance tax of something like nine thousand dollars. He was very anxious to sell and, if he could make a cash deal, would give the buyer the advantage of the prepaid insurance. Mr. Heineman stated that the price appearing in the advertisement ($5,250) was a mistake of their office or of the newspaper, and that the listed price was in fact $5,500. Mr. Day, however, was willing to sell for $5,250, if he could close the deal at once. Day said his bookkeeper, a Mr. Craver, had the books, and that he paid him thirty or thirty-five dollars per month for keeping them. Day and Mr. Heineman left Warren and wife for a few moments to give them an opportunity to discuss the matter. When the four reassembled, Warren gave the broker's agent his check for five hundred dollars as earnest money. Mr. Day handed the lease to the restaurant to Mrs. Warren, but almost immediately asked her for its return, stating that he had an immediate, important business engagement. She requested leave to take it home with her so she could read it, but he would not permit her to do so.

The foregoing paragraph is, for the most part, a digest of testimony given by Mr. Warren, but is, in almost every particular, corroborated by Heineman, the broker's agent, particularly as to gross income, large profits, amount of surplus on hand, and that Day was willing to sell at a low price if the restaurant could be sold for cash and quickly, as it was imperatively necessary that he attend to the important matters in the East. We quote from Mr. Heineman's testimony:

"Q. Explain what took place in regard to the lease. A. We were discussing the terms of the lease and Mrs. Warren asked to see it and Mr. Day gave it to her. She looked at it very briefly and wanted to keep it over night, but Mr. Day refused to allow her to do so. I questioned him about it and he explained that the buyer could operate under the old lease or could negotiate for a new one. He said it was possible and that was included in the agreement."

The agreement to purchase entered into on March 19th is a long printed form. Under a black-letter line, reading, "(Fully set forth all the terms of this transaction in the following blank space)," the broker's agent inserted:

"$5250.00. All cash. Prices includes all stock, fixtures and equipment except small electric clock in kitchen as follows—$2500 stock & equipment & fixtures; $2750 for Good Will. Price also includes all insurance premiums on existing policies except any premiums which are not due or paid. Mrs. Day agrees to stay at least one week with buyer & show seller all buying connections, etc. *Buyer to negotiate new lease or if unsatisfactory is to operate on Sellers' present lease.* Buyer agrees to release $2500 to seller on Mar. 21, 1945. *Balance when affidavit of bulk sales is released.*" (Italics ours.)

(We do not know exactly what was intended by the last sentence in the foregoing quotation. There is no testimony in the record that throws any light on it. We are strongly inclined to think that, by the use of the word "released," the parties meant something more than that the balance of the purchase price was to be paid when the bulk sales affidavit was filed. Presumably, it was the intention to provide that the balance should be paid when the creditors' claims, if any, were satisfied and discharged.)

It is clear, however, that the Warrens were not merely buying a stock of knives, forks, and dishes, and other restaurant equipment, but a going business. The right to continue it at its then location was of greater value than the equipment, as is expressly shown on the face of the agreement itself by the price segregation therein made. According to Mr. Heineman's testimony, as we have already seen, at the meeting in the hotel at Spokane when the bar-

gain was made and Warren paid the earnest money, Day represented that the lease was such that the Warrens could carry on under it, and, clearly, that is the plain meaning of the sentence in that paragraph of the agreement stating the terms of the sale, which reads: "Buyer to negotiate new lease or if unsatisfactory is to operate on Sellers' present lease."

As we have hitherto pointed out, a mere glimpse of the lease was given to Mrs. Warren at Spokane. According to both Warren and Heineman, she had opportunity to read the first two or three paragraphs only. The instrument is three pages in length. If Mrs. Warren had gotten beyond the first fourteen lines, she would have discovered that the lease was for a term of five years, beginning October 15, 1944, and ending October 14, 1949; that is to say, that, at the time the agreement of purchase and sale was made, the lease still had four years and nearly seven months to run. From unrebutted testimony, it can legitimately be inferred that she could not have arrived at the following lines, since they constituted the fourteenth and fifteenth from the very end of the instrument:

"That this lease shall not be assigned, nor said premises sub-rented without the written consent and approval of first party."

As both Warren and the plaintiff's agent testified, and their testimony was not rebutted, Day permitted Mrs. Warren to read only a paragraph or two of the lease and refused to permit her to take it home for examination. Had she been permitted to do so and had shown it to a lawyer or even to an experienced layman, she would undoubtedly have been advised that there was not the slightest probability that a landlord who exacted that lease would consent to an assignment or subletting without receiving some new and valuable consideration. The lease throughout is a very harsh instrument. As indicative of this and because its text is relevant to a question presented by the cross-appeal in this case, we quote the concluding paragraph:

"That in the event second parties default in the terms of this agreement, in any respect, first party shall have the

option of enforcing specific performance, or of terminating this lease, and in the latter event, second parties agree to pay to first party the sum of One Thousand Dollars ($1000.00) as liquidated damages, for any such termination upon default; this penalty to apply to both the original term and any extension thereof; that security shall be given to guarantee the payment of said $1000.00, in the event of termination for failure to perform the terms hereof."

(The Days furnished the security in the shape of a one-thousand-dollar bond, which, as will be later shown, remained in full force and effect when and after the sale with which we are here concerned was attempted.)

We return to the chronological development of the transaction. On March 19th, Mrs. Warren not only signed the purchase and sale agreement on behalf of her husband and herself, but paid the plaintiff, brokerage partnership, by check, $4,750, which, together with the earnest money paid by her husband the previous day, made up the entire purchase price. It will be remembered that, of this amount, the Days were to receive twenty-five hundred dollars on March 21st, and the balance, less the broker's commission, "when affidavit of bulk sales is released," whatever that may mean. The bulk sales affidavit was drawn in the broker's office on March 19th, immediately after the execution of the agreement, and was then and there signed and sworn to before a notary by C. Roger Day.

On Tuesday evening, March 20th, the Warrens went to Walla Walla. On Wednesday, the twenty-first, the brokerage firm paid twenty-five hundred dollars of the purchase price to the Days, as provided for in the agreement. On that day, Mrs. Day also signed and swore to the bulk sales affidavit—the key to the payment of the balance of the purchase price. Warren accompanied her to the auditor's office and testifies that she was there asked by a clerk whether there were any creditors, and that she answered, no. Whether that be true or not, is immaterial, since it is certain that both of the Days took oath as vendors that the business which they were selling to the Warrens had no creditors whatsoever to whom they were indebted,

" . . . for or on account of any services, commodities, goods, wares or merchandise, and/or fixtures and equipment, used in and about or furnished to the business of the vendor[s], or for or on account of money borrowed to carry on the business of the vendor[s]."

(It was indisputably proven at the trial that this affidavit was false. There was a purchase-money mortgage on the equipment, and there was other indebtedness. C. Roger Day did not appear at the trial, nor was his deposition taken. Mrs. Day testified that she knew that there was a purchase-money mortgage on the equipment, and other debts.

"Q. Do you know when the mortgage was put on the equipment, the date of that? MR. GOSE: If you know. A. In October [1944], before we opened, sir. MR. SHERWOOD: Mr. Gose has produced the mortgage for $500.00, $40.00 per month with a final payment of $60.00 paid 5-7-45. Q. There was a balance of over $300.00 when you paid it off finally? A. I don't believe it was over $300.00. All regular payments had been made."

Prior to the introduction of the foregoing evidence, it was stipulated between the attorneys for the parties that the mortgage was satisfied in May, 1945, by the payment of three hundred dollars.

It was also indisputably proven at the trial that, at the time the bulk sales affidavit was made, the Days owed the McCrary Hotel Supply Company, of Seattle, Washington, $104.59, with respect to knives, forks, dishes, plates, glasses, and other miscellaneous restaurant equipment purchased in the fall of 1944. This bill was paid by a check of Mrs. Day's mother on November 19, 1945, about eight months after the bulk sales affidavit was made, about four months after this action was begun, and less than a month before it went to trial. The creditors' invoices and the check above referred to are exhibits in the case.)

On March 21st also, the Warrens and Mrs. Day, working together, inventoried the equipment and supplies and made out the bill of sale, attaching the inventory thereto. At the trial, the landlord, LeRoux, went over the inventory and claimed as his property numerous items listed therein,

among them stools, a table, and some knives and forks. This evidence was not rebutted. Mr. LeRoux, however, claimed an additional number of articles of considerable value, which had been installed by the Days, on the ground that they were fixtures which could not be removed from the freehold. Since the Days attached them as tenants, and not as owners of the freehold, they will be given the benefit of all doubts as to their ownership.

Warren testified that, after the bulk sales affidavit was filed, he wanted to see the landlord, and Mrs. Day said that LeRoux was a very busy man and could not be seen that day. He further testified:

"A. Thursday afternoon she said she would make it a point to see Mr. LeRoux and she said for us not to say anything about buying it, but to say we were running it and then we could get the lease."

LeRoux testified that when the Warrens and Mrs. Day called on him, he made it very plain that he would not give the Warrens a lease or recognize an assignment, and that the Warrens at least so understood him is corroborated by a letter in evidence which they wrote to the broker on March 23rd, more fully explaining a telegram they had just sent them:

"HOLD BALANCE OF PURCHASE PRICE DEPOSITED BY US ON MARCH 19 ON PURCHASE OF ROGERS CABIN RESTAURANT UNTIL FURTHER NOTICE. LETTER FOLLOWS. SITUATION MISREPRESENTED BY DAY. LANDLORD REFUSES TO RECOGNIZE OUR POSSESSION."

The Warrens, however, had already begun operating the restaurant and continued to do so for about a week, upon the continued assurance of Mrs. Day that she would get LeRoux to recognize them as tenants in some way or other. This status continued until March 30th. On that day, the Warrens were summoned to the office of Mr. Snyder, LeRoux's attorney. Mrs. Day was present, and she testified it was there agreed that the Warrens could have a lease. We quote from her testimony:

"Q. Did Mr. Snyder ever prepare any sort of agreement with regard to making a new lease to Mr. and Mrs. Warren

and releasing you? A. Yes, he did. Thereupon Defendants Day's Identification 3 was so marked by the clerk. Q. I hand the witness Defendants Day's Identification 3 and will ask you what that is, if you know? A. *This is the agreement that Mr. LeRoux's attorney, Mr. Snyder, wrote, an agreement for the lease on the Cabin for the Warrens.* Q. Who was present when that was prepared? A. Mr. Snyder prepared that for Mr. LeRoux after a conversation with me. Q. Were the Warrens present at the time this was discussed? A. *The Warrens were present after that was made up. They saw they could get the lease.*" (Italics ours.)

An unexecuted copy of the document which Mrs. Day testified, as above shown, was an agreement for the lease of "The Cabin" by the Warrens was put in evidence, and its text is as follows:

"THIS AGREEMENT, made and entered into this ——— day of March, 1945, by and between FRANK LEROUX, as Party of the First part, and C. ROGER DAY and GLENNA DAY, his wife, as Parties of the Second Part, WITNESSETH:

"WHEREAS, on the 30th day of September, 1944, the parties hereto entered into a lease covering the operation of the property known as 'The Cabin' in the City and County of Walla Walla, State of Washington, and

"WHEREAS, the said lease provided for the forfeiture of the lease, together with the payment by the Lessees to the Lessor of the sum of $1,000.00 as liquidated damages upon the declaration of a forfeiture or upon any default, and

"WHEREAS, the Lessees are now interested in forfeiting the said lease.

"Now THEREFORE, It Is MUTUALLY AGREED AS FOLLOWS:

"Frank LeRoux does hereby acknowledge receipt of the sum of $1,000.00 in hand paid in full and final settlement of all claims and demands arising under the said lease for any breach or forfeiture thereof.

"IT IS FURTHER MUTUALLY UNDERSTOOD AND AGREED that the said lease is hereby declared to be null and void and of no further force and effect between the parties hereto.

"IT IS FURTHER MUTUALLY UNDERSTOOD AND AGREED that C. Roger Day and Glenna Day are interested in the sale of the business operated as 'The Cabin' to Hubert Warren and Rita Warren, and Frank LeRoux does hereby agree to negotiate with the Warrens for a new lease upon terms which shall be mutually acceptable to both parties, and in event the terms of such a lease cannot be agreed upon the Warrens

shall have the right to operate 'The Cabin' on a month to month tenancy.

"IN WITNESS WHEREOF, the parties have hereunto affixed their hands and seals this 29th day of March, 1945."

Mrs. Day testified that she executed the above agreement, which is in no sense a lease. Furthermore, LeRoux never executed it. Apparently, the Warrens did not linger around to learn whether he would or would not sign it. They were not even parties to the instrument. At the most, if they could be regarded as third party beneficiaries, it would have bound LeRoux to no more than to give them a month to month tenancy, which to them was of no value whatever. However, the instrument (Mrs. Day having signed it) does establish that she was willing to pay one thousand dollars to get out from under the lease on the premises. LeRoux's failure to execute the agreement indicates that he preferred to hold the Days to their lease, and it would seem that they so interpreted his refusal; for they kept on paying the rental prescribed therein right up to the date of trial.

Immediately after the March 30th conference in Mr. Snyder's office, the Warrens concluded that the Days could not perform the contract and went back to their home in Spokane; first, however, arranging, through an attorney, for an accountant to go to the premises and make a financial record of their operations during the days when they were waiting for their lease or the right to operate under the Days' lease, and to salvage such perishable supplies as remained on the premises. Mrs. Day, on the same day, departed to join her husband in the East.

We again return to the chronological development of the controversy. On Saturday, April 7th, Day, by wire from Evansville, Indiana, demanded of the Elmendorf-Anthony Company that it release and send to him $2,750 not later than the following Tuesday. On July 13th, Day's attorney demanded the balance of the purchase price from the broker, and on July 18th, Warren's attorney made a similar demand on behalf of his clients. It appears from the letters that the seeming delay in following up the matter is to be accounted

for by the fact that the respective attorneys had been engaged in an effort to make a settlement.

On July 28th, the Elmendorf-Anthony Company began this action against the Days and the Warrens in disclaimer and interpleader, depositing $2,250 in the registry of the court. It had paid the Days $2,500 on March 21st. The payment into court left $500 of the $5,250 paid to them by the Warrens in its possession. This it retained as its commission. Both the Days and the Warrens appeared by answer and cross-complaint, and these, with the various replies and other necessary pleadings, amount in all to twenty-nine pages. Disregarding some minor matters, the positions taken by the respective parties were as follows:

The plaintiff, brokerage company, claimed the right to retain five hundred dollars as a commission.

The Warrens claimed the $2,250 deposited in court, and, on the ground that no actual sale had been consummated, the five hundred dollars which the plaintiff had withheld as a commission.

The Days claimed the $2,250 deposited in court and prayed for judgment against the plaintiff for the five hundred dollars which the plaintiff had retained as a commission, on the ground that plaintiff had breached the agency agreement by refusing to account on demand, and "therefore had not earned any commission." The Days further pleaded:

"That pursuant to said Agreement, marked 'Exhibit A,' the sale of the business known as 'The Cabin' was completed and delivery of the subject matter was made to Defendants WARREN, that at all times herein mentioned Defendants WARREN have and now are in possession of the subject matter of said sale; that said property now is located at No. 214 Boyer Avenue, Walla Walla, Washington, the use and occupancy of said location being permissible because of Defendants DAY's lease with the owner of said premises, as mentioned in 'Exhibit A.' herein; that as a result of said occupancy under said lease, Defendants DAY have paid rental moneys from the 21st day of March, 1945, at the rate of $100.00 per month and will be required to pay $100.00 per month during each and every month that Defendants WARREN continue to occupy said premises; that Defendants DAY are by contract entitled to reimbursement for all rentals

paid on and after March 21st, 1945; that Defendants WARREN refuse to reimburse Defendants DAY for said sums."

(It was established at the trial that the Days had made nine one-hundred-dollar monthly payments to LeRoux.)

The trial court entered a decree which, omitting certain inconsequential details, directed (1) that the Elmendorf-Anthony Company pay into court the five hundred dollars which it had retained as its commission; (2) judgment in favor of the Warrens against the Days for $5,250, with interest, but subject to a credit for nine hundred dollars, this being the rental paid by the Days to LeRoux for the period from March 15 to December 15, 1945; (3) that the clerk pay over to the Warrens the $2,250 then in the registry, and the additional five hundred dollars when received from the plaintiff; and (4) that the Warrens have a lien on all the personal property of the Days used in conducting the restaurant for the balance of their judgment remaining unpaid after crediting the nine hundred dollars, above mentioned, thereon, and receiving the funds in the registry. Plaintiff has not appealed from the decree. The Days, in due course, appealed from "each and every part" thereof. The Warrens have cross-appealed from that portion which allows the Days a credit of nine hundred dollars.

The most significant portion of the evidence in this case has already been stated. We do not think it necessary to go into further detail. It should be added, however, that Mrs. Day, using certain cash register receipts, excise tax receipts, and other miscellaneous material, testified that the gross income for the month of January, 1945, was $3,890.30; for February, $3,729.60, and for March until the twentieth, $2,808.85. She also testified that the net profit in the preceding fall months was in excess of eight hundred dollars per month, and that she so concluded because the net was forty per cent of the gross. She could only estimate the amount of the overhead.

It seems quite apparent that the Days kept no books in any real sense. As hitherto noted, Warren testified that, at the original meeting with Day, Day asserted that he paid a

Mr. Craver, an accountant, thirty or thirty-five dollars per month to keep the books of the restaurant, and that the gross receipts were more than four thousand dollars per month. That would tend to induce Warren to believe that Day's statements as to restaurant income were correct and accurate. Mrs. Day was interrogated about that matter:

"Q. Did Mr. Warren try to see the books at Mr. Craver's office and there weren't any books? A. Mr. Craver didn't have the details. *When Mr. Day got him to take care of the accounts he didn't know that I would have to take the accounts down.* I had to take care of the business and I did not have an opportunity to go down to Mr. Craver's office all the time." (Italics ours.)

Mr. Craver was the man whom the Warrens' attorney sent to the restaurant on March 31st to make up a financial account of their operations. He was called as a witness with respect to that, and for another purpose. At the time of the trial, he was keeping the books of twelve restaurants. He testified that the average profit of the restaurant business in the Walla Walla area did not exceed twenty per cent, and, incidentally, he further testified as follows:

"Q. Did you keep books for the C. Roger Day Cabin Restaurant? A. No. Q. You never did? A. No. Q. *Did they ever supply you with any information? A. No.*" (Italics ours.)

The first question and answer on cross-examination of Mr. Craver was: "Question: You didn't have anything to do with the Cabin prior to March 31, 1945? Answer: No."

These considerations, of course, do not go to the heart of the matter, which is the failure of the Warrens to get the going business they bargained for, but they do throw light upon the credibility of the Days, or rather, their lack of it.

As we interpret the oral opinion of the trial court, its decision was based upon two grounds, (1) that the Warrens were entitled to rescind because the Days did not, and could not, deliver to them the thing that they had paid for; and (2) — but, here, we will quote the language of the court:

"I am satisfied the Days never intended in any wise to defraud the Warrens. I am sure the Days felt they would be able to obtain an assignment of their lease or obtain a new lease and the sale would be consummated. Now it was also the Days' duty to inform the Warrens about that lease and the conditions of it. It is inconceivable that a man, if he had comprehended and understood that it had a clause in it that he could not operate under the lease and equally so it would depend upon the landlord giving a new lease, would buy. That was the essential element in the minds of the plaintiff and the minds of the Days."

The court said, at another point in the oral opinion:

"The one essential element of the sale was lacking. There was a duty on the plaintiff and the Days to explain to the Warrens the condition of that lease. While there was not any actual nor any intention of fraud perpetrated by them, but it had the effect of fraud in failing to notify and explain to the Warrens with reference to that lease."

█ Seizing upon the language of the court's opinion, as above quoted in part, the appellants insist that it is equivalent to a holding that fraud was not proven by the necessary clear, cogent, and convincing evidence. But this is not a tort action for fraud, but an action for rescission. No doubt, the court had in mind such cases as are referred to in the following excerpt from *Walsh v. Wescoatt*, 131 Wash. 314, 318, 230 Pac. 160. In speaking of certain cases which had been cited, the court said:

"They are cases where the plaintiff sought rescission because of misrepresentations, and the courts held that there might be rescission notwithstanding the misrepresentations were not fraudulently made, and that intent was not a controlling factor. This court has long since aligned itself in rescission cases with this doctrine."

In our opinion, the cases of *Jankowsky v. Slade*, 60 Wash. 591, 111 Pac. 773, and *Blum v. Smith*, 66 Wash. 192, 119 Pac. 183, sufficiently sustain the decision of the trial court on the main issue. If, however, we considered it necessary to find active fraud on the part of the Days in order to sustain the decree, we think it would not be difficult to point out badges thereof at almost every stage of the attempted transaction.

■ On the cross-appeal, it is stoutly contended that the court erred in allowing the nine-hundred-dollar credit to the Days. As to this matter, we quote the complete text of appellants' "Answer to Cross Appeal," as set out in their reply brief:

"Respondents' cross-appeal is based on alleged error by the Trial Court in awarding Appellants $900 covering rental monies paid by Appellants while Respondents were in possession of the restaurant premises.

" 'The right of a lessee, who after an assignment of the lease, has paid the rents which subsequently accrued, to recover the same from his assignee is generally recognized.' 32 A.L.R. 1439.

"As a matter of equity, Respondents' cross-appeal seems conscionable only if it can be shown the Respondents were evicted from the premises. This is not shown by the facts. Respondent Warren testified that they were not evicted.

"Appellants submit that the Trial Court did equity as to the $900 rental monies paid."

Referring first to the quotation from 32 A. L. R., we do not find it apposite. The Days had no right to assign, and the Warrens never became the *assignees* of the Days.

Referring to the paragraph immediately following the quotation from A. L. R., the answer is that the Warrens never became tenants. The fact that LeRoux did not eject them as trespassers, but allowed them to remain there a week while attempting to settle their difficulties with the Days, did not make them his tenants. As we have hitherto seen, Mrs. Day, on March 30th, attempted to forfeit the lease the Days held and was unsuccessful. If they defaulted in paying the prescribed rent, they faced a heavy liability on their bond. They, therefore, remained tenants of LeRoux and continued to pay the rent which the lease obligated them to pay.

Although appellants' counsel do not stress the matter, it appears, from the court's oral opinion, that the allowance of credit was made because the Warrens failed to return the keys when they left the premises. Hence, it is said the Warrens remained in possession, and it is, therefore, concluded that the nine hundred dollars was paid for their

benefit. But the Warrens never claimed rightful possession at any time. They repudiated the deal as early as March 23rd, and, as the trial court has correctly held, rightly did so. The Days could not have paid rent on the Warrens' behalf, since LeRoux refused to recognize the Warrens as tenants. They never owed him or anyone else any rent.

There are many cases in the English law reports, and some in the American reports, wherein it is held that the tender of the keys to the landlord is a surrender of possession. Perhaps, it may be reasonably contended that the *retention* of keys should, by a parity of reasoning, be taken to indicate a retention of possession. But however that may be, as is pointed out in 32 Am. Jur. 767, § 906, the legal effect of the delivery of keys, as applied in surrender cases, depended largely upon the intent with which they were handed over, and a warning is issued against attaching undue importance to the mere fact of delivery. And so, here, undue importance should not be attached to the mere fact of retention, especially when, as in this case, the Days were somewhere in the east and the keys were readily available to Mrs. Day's father when he wanted to show the premises to prospective purchasers, a privilege of which he made use.

We cannot imagine any theory upon which the Warrens could have denied the Days possession during the period involved. The Warrens never claimed or had right to possession at any time. They had repudiated the transaction as early as March 23rd, before any of the nine hundred dollars was paid. They were actively maintaining a lawsuit during a large portion of the very period with respect to which the nine hundred dollars was paid, based upon the very fact that the Days had been unable to give them possession. In paying the nine hundred dollars, the Days were paying rent to their legal landlord according to the terms of their lease. Equity looks at realities and will not mulct the Warrens of nine hundred dollars merely because they failed to return a key.

This cause will be remanded to the trial court, with directions to strike from the decree the award of the credit of nine hundred dollars in favor of the Days on the judgment rendered against them in favor of the Warrens. In all other respects, the decree will stand affirmed. It is so ordered.

 It appears from the records of this case that $2,750 was paid into the registry of the court to be paid to respondents Warren. It appears further that appellants Day executed and filed in the superior court their supersedeas bond in the sum of five hundred dollars, conditioned to "pay all costs and damages. . . ," and to "satisfy and perform the said judgment appealed from insofar as it directs the Clerk of said Court to pay over to the Defendants WARREN said sum of $2,750."

We are of the opinion that respondents were entitled to be paid interest on the money in the registry of the court, the reason being that they suffered damage because of the fact that the money which belonged to them and which was in the registry of the court was not immediately paid to them and they had no opportunity to make use of it for their own purposes. It was clearly apparent that the conditions of the supersedeas bond included the obligation to pay any damage that might be suffered by respondents because of the withholding of the money in the registry of the court.

MILLARD, SIMPSON, JEFFERS, and SCHWELLENBACH, JJ., concur.