[No. 52682–6. En Banc. November 12, 1987.]

SKAGIT STATE BANK, *Petitioner,* v. RUSSELL RASMUSSEN, ET AL, *Respondents.*

*Bannister, Bruhn & Clark,* by *Stanley K. Bruhn,* for petitioner.

*Michael L. Lewis,* for respondents.

BRACHTENBACH, J.—Skagit State Bank brought this action to foreclose a mortgage on 60 acres of land, known as the "Bulb Farm," and to obtain a deficiency judgment. The issue is whether Robert Hayton, who voluntarily signed loan and mortgage documents without reading them, may avoid the obligations contained in them because the legal effect of the documents was misrepresented to him. The trial court and the Court of Appeals held that the docu-

ments were voidable by Hayton. We reverse.

In 1973, Hayton, Thomas Flint, and Russell Rasmussen formed a partnership, the Dry Slough Hay Company. In 1974 the partners purchased the Bulb Farm. Following sale of Dry Slough's last crops, the partners divided the partnership assets, but retained the Bulb Farm as tenants in common, each owning a one–third undivided interest.

In 1976, Flint, Rasmussen, and Arnie Garborg formed another company, Snow Goose Produce, Inc. Also in 1976, Hayton, Flint, and Rasmussen entered a written agreement which provided that Hayton would have undivided use of the northern one–third of the Bulb Farm, and that Flint and Rasmussen would have undivided use of the southern two–thirds. Snow Goose then raised vegetables on the southern two–thirds, the portion that Flint and Rasmussen had use of by the terms of that agreement.

In 1977, Snow Goose applied for a $350,000 Small Business Administration (SBA) loan. Flint and Rasmussen worked directly with Skagit State Bank on the application. Skagit State Bank initially rejected Snow Goose's application, but eventually approved the loan subject to an agreement that, along with other property, the Bulb Farm would secure the loan.

The loan documents, including a promissory note for $350,000, a mortgage of the entire Bulb Farm in favor of Skagit State Bank, an SBA guaranty, and an addendum to the guaranty were prepared mostly by the SBA, with the possible exception of the mortgage. In March 1978, Flint picked these documents up at Skagit State Bank and took them to Hayton's farm for Hayton's signature. Flint testified that he explained to Hayton that his understanding of the nature of the documents was that they would allow Flint and Rasmussen to "pledge" their share of the Bulb Farm without splitting it up. Hayton's testimony was similar; he testified that Flint explained that his signature would enable Flint and Rasmussen to use their two–thirds interest in the farm as security for the loan.

Hayton testified that he remembered the note which he

signed, but he claimed that he saw only the signature side of it. He said that he did not read the note, or look at the front of it. He remembered signing the note and printing or signing his wife's name on it. Hayton did not recall signing any of the other documents, but admitted that his signature appears on them. Although Hayton said that he did not read any of the documents, he stated that he would have understood them if he had read them. Hayton has a master's degree in English literature, and has had considerable experience in buying real estate of substantial value.

Flint, Rasmussen and Garborg also signed the note, the mortgage, and the guaranty, but did not sign the addendum to the guaranty.

After Hayton signed the documents, a Skagit State Bank employee notarized the mortgage at the bank. The acknowledgement is false, since Hayton signed away from the bank and out of the employee's presence. The bank thereafter loaned the $350,000 to Snow Goose.

Hayton had no contact with Skagit State Bank about the SBA loan transaction, either before or after he signed the documents, until April 1980. At that time he received a notice of default on the loan. Subsequently, Skagit State Bank brought this action to foreclose the mortgage on the Bulb Farm, and to obtain a deficiency judgment against Hayton, Flint, Rasmussen and Snow Goose.

The trial court dismissed Skagit State Bank's claims against Hayton. The court found that Hayton had signed the documents as a result of Flint's representation that Hayton's signature was necessary only to allow Flint and Rasmussen to use their interests in the Bulb Farm to secure the loan. The court concluded that Hayton was not negligent in signing the documents. The court further concluded that Flint was Skagit State Bank's agent and that the bank was bound by Flint's representations as to the effect of the documents which Hayton signed. The court held that Hayton was not obligated by his signatures on the documents.

Skagit State Bank appealed. The Court of Appeals

affirmed. We granted review.

■ The relevant principles are summarized in *National Bank v. Equity Investors,* 81 Wn.2d 886, 912-13, 506 P.2d 20 (1973):

It is a general rule that a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents. *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P.2d 661 (1934). One cannot, in the absence of fraud, deceit or coercion be heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose contents he was in law bound to understand. [The plaintiff], being not only a person of ordinary understanding but one with more than ordinary experience in land transactions and instruments of conveyance and security, and with time and opportunity both to consult with an attorney and to inspect the instruments before signing, cannot now be heard in law to repudiate his signature. The whole panoply of contract law rests on the principle that one is bound by the contract which he voluntarily and knowingly signs. As we said in *Lake Air, Inc. v. Duffy,* 42 Wn.2d 478, 480, 256 P.2d 301 (1953):

Appellant had ample opportunity to examine the contract in as great a detail as he cared, and he failed to do so for his own personal reasons. Under these circumstances, he cannot be heard to deny that he executed the contract, and he is bound by it.

and we would adhere to the principle stated in *Johnston v. Spokane & I.E.R.R.,* 104 Wash. 562, 569, 177 P. 810 (1919), that

It would be impossible for a person of ordinary intelligence, much less a person of the intelligence and ability of appellant, to have misunderstood the contents of this instrument upon a casual reading thereof . . .

We have always held that a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein.

The principles enunciated in *National Bank* are sound. We apply them here and conclude that Hayton has failed

to establish that under the circumstances he should not be bound by his signatures.

First, there is no evidence that Hayton was deprived of the opportunity to examine the documents. While he was busy when Flint brought the documents, spoke only briefly with Flint, and signed the documents on the flat bed of a truck, there is no indication in the record that Hayton did not have the time or the opportunity, or could not have taken the opportunity, to read the documents or to consult an attorney.

Second, there is no question that the documents are plain and unambiguous. The note for $350,000 which Hayton signed is a single piece of paper which is printed except for the usual typewritten terms. It is clearly headed "Note" in large type. The principal amount of the note appears clearly at the top of the front of the page as well as in the body of the instrument. Hayton signed his own name and that of his wife. Below his signature is typed "Robert Hayton, individually and as partner d/b/a/ Dry Slough Hay Co." Above his signature is typed:

> All of the obligations contained herein shall be considered joint and several obligations of each signer hereof. The signature of a married man or a married woman on this note shall constitute his or her consent that his or her separate property as well as the community property is liable for the debt obligations evidenced hereby.

Exhibit 2, at 2.

The mortgage Hayton signed is also a 1–page document. It is printed, with terms typed in, and has a schedule attached, which Hayton also signed, which contains the legal description of the Bulb Farm. At the top of the page the word "mortgage" appears in block letters one–half inch high. The figure "$350,000," typed both in letters and numbers, appears less than 6 inches above Hayton's signature. Exhibit 3.

The SBA guaranty which Hayton signed is entitled "guaranty" in letters larger than the print in the body of the document. The figure $350,000 appears below Hayton's

name in the introductory paragraph. Five lines above Hayton's signature begin the words "such signers, if more than one, shall be jointly and severally liable hereunder." Below his signature is typed "Robert Hayton, individually & as Partner, d/b/a/ Dry Slough Hay Co." Again he signed or printed his wife's name. Less than 1 inch below his signature is a paragraph entitled "Note.—" This paragraph uses the words guarantor or guaranty five times. The word guaranty is also found immediately below this paragraph in block letters at least twice the size of the letters in the body of the document. The guaranty is also a single page document. The "$350,000" figure is prominent. Exhibit 4.

The final document Hayton signed is a typed, single page document entitled "Addendum to Guaranty." He signed his name and printed or signed his wife's name. Below his name is typed "Robert Hayton, individually and as partner, d/b/a/ Dry Slough Hay Co." The Haytons are the only signers to this document. Just above Hayton's signature is typed, in capital letters:

All property now held or hereafter acquired, held or to be held by said parties, separately, jointly, or in community, will be liable for the principal, interest and other legal charges of the loan hereby represented in the event of default on said loan, and it is on the basis of the representations herein contained that said loan is disbursed by the SBA.

Exhibit 4, Addendum to Guaranty.

Even the most casual reading of these documents would have revealed their legal effect. The guaranty form alone requires only a glance to determine its nature—it is entitled "Small Business Administration (SBA) Guaranty", and contains in close proximity to Hayton's signature the words guarantor and guaranty *six times.*

Third, there is absolutely no question about Hayton's ability to understand the documents he signed. He was well educated and experienced in land transactions (which he felt competent to handle without the assistance of an attorney). In fact, Hayton stated that he would have

understood the documents had he read them.

Finally, there is no claim that Flint's conduct constituted fraud, deceit or coercion. There is no claim of overreaching or unequal bargaining power. The sole basis proffered for avoidance of the contractual obligations contained in the documents is Flint's mistaken explanation of the legal effect of the documents. This conduct, which is at most an innocent misrepresentation, is not a sufficient basis to justify avoidance under the circumstances in this case.

We have recognized that a material innocent representation may, in certain circumstances, be a sufficient basis for a claim for contract rescission. *See Anthony v. Warren,* 28 Wn.2d 773, 786, 184 P.2d 105, 190 P.2d 88 (1947); *Algee v. Hillman Inv. Co.,* 12 Wn.2d 672, 674, 123 P.2d 332 (1942). Thus, for example, honest mistaken representations as to the boundaries of land can form the basis for rescission of a contract to purchase the land. *Algee,* at 674–75. In order to avoid contract obligations on the basis of a material innocent misrepresentation, however, the party seeking avoidance must, among other things, establish that he or she justifiably relied upon the misrepresentation. *See* Restatement (Second) of Contracts § 164(1) (1981).

In regard to this requirement, this court has stated that reliance upon a fraudulent representation "must be reasonable under the circumstances, that is, a party may not be heard to say that he relied upon a representation when he had no right to do so." *Williams v. Joslin,* 65 Wn.2d 696, 698, 399 P.2d 308 (1965); *see also Rummer v. Throop,* 38 Wn.2d 624, 633, 231 P.2d 313 (1951). The court has emphasized that "[t]he right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him." *Williams,* at 698; *Puget Sound Nat'l Bank v. McMahon,* 53 Wn.2d 51, 54, 330 P.2d 559 (1958). The extent to which the representee must verify the truth of the representation, if he or she must do so at all, depends upon the circumstances of the case. Thus, where

representations were made as to facts peculiarly within the speaker's knowledge, no duty to investigate was found and the buyer of land was entitled to rely on the representations. *Jenness v. Moses Lk. Dev. Co.,* 39 Wn.2d 151, 234 P.2d 865 (1951). In *Williams v. Joslin, supra,* on the other hand, reliance on a party's false oral representation as to gross business income was not justified where the other party asked to see receipts of business income, and then failed to examine them. The receipts would have revealed that the oral representations were false.

It requires little in the way of diligence to ascertain the truth of a representation made as to the legal effect of plain and unambiguous documents which a party has the opportunity to read. A party generally cannot escape the duty of reading the documents (the duty to "investigate" by simply reading the documents in order to know their contents) in the absence of a showing that he or she was unable to read or understand the language used, that there was a special relation of trust and confidence in the representing party, that some artifice was employed to obtain his or her signature, or that something was done to prevent his or her reading the document. *See Perry v. Continental Ins. Co.,* 178 Wash. 24, 28, 33 P.2d 661 (1934).

Hayton has made no such showing. Although the evidence shows that Flint had been a long–time close friend and business partner of Hayton's, this relationship alone does not justify Hayton's reliance. There is no evidence of a fiduciary relationship and no evidence establishing a special relationship of trust and confidence. Hayton and Flint's friendship and former business relationship alone do not justify Hayton's reliance. If they did, one could escape the legal consequences of signing under the circumstances here by later asserting "I read nothing, but I am excused because I relied on the opinion of my friend, fellow farmer and former partner as to the legal effect of my five signatures." This result would create an intolerable degree of uncertainty in contracts of all kinds.

Moreover, Flint's testimony established that he related

to Hayton *his* understanding of the nature of the documents. Hayton, who knew that Flint was a borrower on the loan, was not entitled to rely on Flint's explanation of *his understanding* of the documents, especially where Hayton was well aware of the undivided nature of the ownership interests in the Bulb Farm and should have wondered whether a bank would allow only a two–thirds undivided interest in the land to secure the loan.

We hold that Hayton is not entitled to avoidance of his obligations contained in the mortgage and loan documents on the basis that Flint misrepresented their legal effect.

Our decision comports with current views respecting a party's own negligence in failing to ascertain the truth of the other party's representations. Whether a party's own negligence will be a defense to a claim for avoidance depends in part upon the nature of the conduct of the party making the representations. On the one hand, "courts will continue to move toward the doctrine that negligence in trusting in a misrepresentation will not excuse positive willful fraud . . .," 12 S. Williston, *Contracts* § 1515B, at 487 (3d ed. 1970), that is, a party's own negligence in the face of *positive, willful* fraud will not preclude avoidance by the party to whom the misrepresentation is made. On the other hand, where mere negligence on the part of the representing party is concerned, leading commentators have noted:

> As negligence becomes an increasingly recognized basis of liability for misrepresentation the question whether contributory negligence is or should be a defense will become increasingly important. The decisions to date are unanimous in recognizing the defense and this accords with the view of commentators and the American Law Institute.

(Footnotes omitted.) James & Gray, *Misrepresentation (pt. 1)*, 37 Md. L. Rev. 286, 314 (1977). *See also* James & Gray, *Misrepresentation (pt. 2)*, 37 Md. L. Rev. 488, 512 n.2, (1978).

Applying these principles here: Flint's conduct was not in

the nature of positive, willful fraud; instead, he failed himself to read the documents whose legal effect he represented. Hayton's fault in failing to read the documents can be likened to negligence. (The trial court's conclusion of law that Hayton was not negligent is not supported by factual findings.) Since Flint's conduct was not equivalent to positive, willful fraud, Hayton's failure to read the documents serves to prevent his avoidance of his contractual obligations. This result accords both with modern views respecting a party's own fault and with our case law respecting those who voluntarily sign contracts without reading them.

We observe that the Court of Appeals relied on Restatement (Second) of Contracts § 172 (1981), which provides that a recipient's fault in not knowing or discovering the facts before making a contract does not make reliance on a misrepresentation unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. Initially we note that none of the illustrations to that section involve a failure to read a contract in combination with reliance on an innocent misrepresentation as to the contents of that contract. In any event, we need not decide whether to adopt § 172 because we believe that even under the standard contained therein Hayton's reliance was unjustified. If we applied § 172, Hayton's failure to make even a cursory examination of the documents would preclude relief. As a comment to the section states: "[i]f the recipient knows that the assertion is false or should have discovered its falsity by making a cursory examination, his reliance is clearly not justified and he is not entitled to relief." Restatement (Second) of Contracts § 172, comment *b* (1981).

In light of our decision that Hayton's reliance was not justified, we need not reach the question whether Flint's representations are attributable to the bank. We observe, however, that the trial court erroneously concluded that Flint was the bank's agent, and his representations were therefore attributable to the bank. There is no finding of fact that Flint was the agent of the bank. The trial court

found no facts establishing the necessary elements to create an agency. The trial court simply entered as a conclusion of law, unsupported by facts found, that Flint was an agent of the bank for the purpose of representing to Hayton the legal effect of the documents.

As we said in *Moss v. Vadman,* 77 Wn.2d 396, 402–03, 463 P.2d 159 (1969):

> We have repeatedly held that a prerequisite of an agency is control of the agent by the principal. . . .
>
> . . . [A]n agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control. . . .
>
> Consent and control are the essential elements of an agency. . . .

(Citations omitted.)

This record is utterly devoid of evidence of consent and control. Hayton's brief cites no testimony, no exhibit, no finding, and no authority supporting the proposition that Flint was the bank's agent with actual authority. Moreover, Hayton cannot rely on apparent authority, since apparent authority depends upon the acts and conduct of the principal. *Equico Lessors, Inc. v. Tow,* 34 Wn. App. 333, 338, 661 P.2d 597 (1983). The bank (the "principal") had no contact of any kind with Hayton which would lead him to reasonably believe Flint had apparent authority to explain the legal effect of the documents. On this record, there is no basis to conclude Flint was the bank's agent.

The Court of Appeals erroneously held that Flint's representation is attributable to the bank because it can be considered to be a third party representation allowing avoidance if the other party (here, the bank) in good faith neither gave value nor changed its position in reliance on the contract nor was the cause of the misrepresentation being made. *See* Restatement (Second) of Contracts § 164(2) (1981); 12 W. Jaeger, *Williston on Contracts* § 1518, at 584 (3d ed. 1970). Flint was clearly a party to the transaction and the bank clearly gave value, the use of its

money, and would not have done so without Hayton's signature.

■ Finally, we consider whether the false notarization renders the bank's mortgage lien upon Hayton's interest invalid. This court has long held that, generally, an unacknowledged deed or mortgage is good as between the parties. *See, e.g., Anderson v. Thursday, Inc.,* 76 Wn.2d 54, 58, 455 P.2d 932 (1969); *Ockfen v. Ockfen,* 35 Wn.2d 439, 441, 213 P.2d 614 (1950); *Bremner v. Shafer,* 181 Wash. 376, 384, 43 P.2d 27 (1935). Therefore, the defect in the acknowledgment does not affect the enforceability of the mortgage between the parties. The fact that the acknowledgment of Hayton's signature was false does not prevent Skagit State Bank from enforcing the mortgage lien upon Hayton's one-third interest.

We therefore reverse.

PEARSON, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Reconsideration denied January 7, 1988.