584 So.2d 1254 (1991)
GODFREY, Bassett & Kuykendall Architects, Ltd.
v.
Huntington Lumber & Supply Company, Inc. and Copiah County Board of Education.
No. 90-CA-0095.
Supreme Court of Mississippi.
July 24, 1991.
John L. Low, IV, Watkins & Eager, Jackson, for appellant.
J. Harold Graham, Crystal Springs, Olen C. Bryant, Jr., Hazlehurst, for appellee.
Before HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ.
HAWKINS, Presiding Justice, for the COURT:
Godfrey, Bassett & Kuykendall Architects, Ltd., appeals from the judgment against it in favor of Huntington Lumber & Supply Company, Inc., and Copiah County Board of Education in the circuit court of Copiah County in the amount of $9,000. We affirm.

FACTS

THE PARTIES
The parties are:
T.A. (Bubba) Huntington, Jr., who owns and does business in the corporate name of Huntington Lumber & Supply Co., Inc., of Hazlehurst (Huntington).
Godfrey, Bassett & Kuykendall, Architects, Ltd., a professional corporation of architects, operating out of Jackson. Arthur Godfrey is the senior member of the firm.

*1255 The Copiah County Board of Education, the owner of the project, whose superintendent is Dale Sullivan.

EVENTS
In 1988 and for the prior fifteen years, the Godfrey firm was the firm employed by the Copiah County Board of Education (the Board) to render all architectural services required by the county school district.
In the spring of 1988, the Board recognized a need to modernize and renovate three areas of the Crystal Springs school:
1. the high school cafeteria,
2. the business department and library of the high school, and
3. air conditioning in the elementary classrooms.
Accordingly on May 2, the Board advertised for bids to be received on May 26 on plans and specifications drawn and prepared by the Godfrey firm. Architectural plans and specifications are generally voluminous and meticulous.
One of the pages of the volume titled "Detail Specifications" reads:
DIVISION 1 GENERAL REQUIREMENTS SECTION 1H2 CONTINGENCIES
1H-1 SCOPE:

(a) The Contractor shall include in his bid the sum of $9,000 to cover the cost of contingencies. Contingencies are described as items necessary or desired to complete the project in accordance with the Owner's desires. In general, these are latent conditions discovered after construction work begins, items omitted from the documents or items which the Owner feels are necessary for a complete project.
(b) In the event no contingency funds are used, the entire amount will be credited to the Owner.[1]
On May 23 the Godfrey firm mailed a document called "Addendum #1" to all contractors who proposed to bid.[2] Item #2 of this addendum stated "Omit the $9,000 contingency from bid."
Huntington was one of the contractors bidding.
When the bids were opened and examined by the Board on May 26, the Board found that the lowest bid, in excess of $300,000, more than the school district was prepared to spend, and no bid was accepted. At the subsequent June 6 meeting of the Board, all bids were rejected. Also at this meeting, the Board decided to develop the renovation piece-meal. Most urgently needed was renovation of the business department and library of the high school, and the Board decided to re-advertise this part, and taking out the air conditioning of this area. The Board thereupon authorized the Godfrey firm to receive bids for this reduced area on June 22.
The Godfrey firm thereupon revised the original plans and specifications by deleting the appropriate areas where renovation was to be postponed. The firm did not prepare new specifications and plans from scratch. The junior member of the firm, Lance Kuykendall, prepared the June documents.
Huntington saw the $9,000 contingency in the specifications, and was interested in determining whether or not it would be deleted by an addendum as it had been deleted from the May specifications. Nine thousand dollars was more than ten percent of the bid he proposed to submit, and *1256 he wanted to be certain on this feature. He therefore called the Godfrey firm in an effort to talk with him. Huntington and Godfrey had known each other for several years and were friends.
On June 21, the day before the bid letting, the two had a telephone conversation, at which time, according to Huntington, Godfrey assured him that the firm was mailing out an addendum which omitted the $9,000 contingency just as it had been omitted from the May specifications.
The firm had in fact prepared and mailed an addendum dated June 20, but this addendum did not omit the $9,000 contingency, which remained in the specifications upon which the Board accepted bids June 22.
Huntington also testified he never saw the addendum to the June specifications. Had he seen it and read it, of course he would have detected that the $9,000 contingency had not been omitted.
Huntington's was the low bid on June 22 at $77,700. Although the contractor was given ninety days to complete his contract, the Board was quite interested in getting the job completed before the 1989-90 school year began, and asked Huntington to start his work immediately. Huntington complied, and began work on the job the next day.
Several weeks later he was sent the contract which had been signed by the president of the Board, and Huntington also signed it. The contract makes reference to an addendum.
It was only later that Huntington learned that the June 20 addendum did not in fact omit the $9,000 contingency. At the subsequent bid opening of the cafeteria renovation under its scaled down specifications, Kuykendall remarked to Huntington that he had a $9,000 contingency clause in his contract.
There were discussions between the Board, Huntington and Godfrey. Without the $9,000 contingency, Huntington was not the low bidder. The Board contacted the Attorney General's Office for an opinion, and decided to deduct the $9,000 from the final payment to Huntington, thereby paying him only $68,700.
Huntington sued Godfrey and the school district through its board. Following a jury trial, he was awarded a judgment against the Godfrey firm for $9,000.
The Godfrey firm has appealed.

LAW
Had Huntington actually seen and read the June 20, 1988, addendum, he would have discovered that the $9,000 contingency in the specifications indeed had not been omitted.
The bid he signed June 22, on a two-page, single-spaced form prepared by the architect, acknowledged:
ADDENDUM RECEIPT: The receipt of the following addenda to the specifications is acknowledged:
Addendum No. 1 Dated June 20, 1988 (underscoring typed in on form)
The contract Huntington signed some three weeks later, but dated as of June 22, contains the following paragraph:
ARTICLE 1
THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 9.
If Huntington's recovery is contingent solely upon the written contract, encompassing by specific reference the plans and specifications, then he of course loses.
*1257 Is he thus limited?
A very strong principle of law militates against Huntington: a written contract cannot be varied by prior oral agreements. Fortune Furniture Manufacturing, Inc. v. Pates' Electronic Co., 356 So.2d 1176 (Miss. 1978), Commercial Credit Corp. v. Long, 225 Miss. 164, 82 So.2d 847 (1955). Moreover, as an evidentiary matter, parol evidence to vary the terms of a written contract is inadmissible. Clow Corp. v. J.D. Mullican, Inc., 356 So.2d 579 (Miss. 1978), Fuqua v. Mills, 221 Miss. 436, 73 So.2d 113 (1954).
Finally, a person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract. McCubbins v. Morgan, 199 Miss. 153, 23 So.2d 926 (1946); Koenig v. Calcote, 199 Miss. 435, 25 So.2d 763 (1946); Skagit State Bank v. Rasmussen, 109 Wash.2d 377, 745 P.2d 37 (1987); Farina v. Calvary Hill Cemetery, 566 S.W.2d 650 (Tex.Civ.App. 1978).
The problem in this case did not arise because Huntington failed to read the June specifications. He read them and found the $9,000 contingency still in them. Because the $9,000 contingency had been removed from the May specifications, and was even more of an anomaly in the much less expensive June renovation, Huntington believed it would be removed.
To make sure before making his bid, Huntington telephoned his friend Godfrey, a man in whom he reposed considerable confidence following over a decade of business dealings.
He expected to be told the truth.
When he and Godfrey talked on June 21, Godfrey told Huntington what he sincerely believed was the truth: that the $9,000 contingency had by a June 20 addendum been omitted.
This is a case of dealings between gentlemen, two honorable men. It is just as clear that when Godfrey told Huntington the $9,000 was omitted from the June 20 addendum, he did not contemplate any necessity on the part of Huntington to go and check to see if what he had told him was true. Godfrey meant for Huntington to accept this statement as a fact. Huntington did so.
As fate would have it, a junior member of the firm, Lantz Kuykendall, actually prepared all the revised plans and specifications, including the June 20 addendum, for the June 22 contract, and through oversight the $9,000 was not removed.
According to Huntington, whose testimony the jury had a right to accept, he had not received the addendum when he made his bid on June 22. He was relying upon Godfrey's statement to him that the addendum, a copy of which (according to Godfrey) had been mailed to him, had removed the $9,000 contingency.
Had Godfrey deliberately represented to Huntington that the $9,000 had been omitted, when he knew it had not, we would of course have a fraudulent representation upon which Huntington would be afforded redress. Fornea v. Goodyear Yellow Pine Co., 181 Miss. 50, 178 So. 914 (1938).
Should he be denied relief because Godfrey made an honest mistake, an honest misrepresentation of fact, and Huntington relied on it? It was this specific misrepresentation of Godfrey which misled Huntington and cost him $9,000.[3]
*1258 This Court has authorized relief from a written contract or deed based upon a mutual mistake, or innocent misrepresentation. In McGee v. Clark, 343 So.2d 486, 488-489 (Miss. 1977):
The representation was material, it induced the appellees to execute the supplemental agreement, and it was false. The result here is the same regardless of whether the misrepresentation was wilfully and knowingly made or whether it was innocently made....
In Rimer v. Dugan, 39 Miss. 477 (1860), the Court stated:
"The record further shows that Defendant had no title to the land he thus claimed to own, and for which complainant exchanged his land.
It is clear from the record that the complainant acted on the faith of defendant's representation, and that such representation was false. Whether the false representation was made with a knowledge that it was false, or with a knowledge that it was true, is wholly immaterial. If, knowingly, here presented what was not true, there can be no doubt he should be bound to make reparation. If, without knowing whether his representation was true or not, he took upon himself to make it to complainant, and upon the faith of it complainant acted, he is not less bound, although he may have been only mistaken, and therefore comparatively innocent." 39 Miss. at 482-583.
Also, in Penn Mutual Insurance Co. v. Nunnery, 176 Miss. 197, 167 So. 416 (1936), it was held:
"His good faith is not the test. If the representation was false, and the appellee was justified in relying upon it, then she agreed to the release under a mistake into which she was led by the affirmative act of the appellant's special agent, and she therefore is not bound thereby, [Citations omitted]." 176 Miss. at 210, 167 So. at 418. (Brackets original)
343 So.2d at 489. Also, Powell v. Plant, 23 So. 399 (Miss. 1898); as to mistake and misrepresentation being ground for relief from a written contract, see generally, Restatement (Second) Contracts (1981), §§ 152, 155, as to mistake, and § 166 as to misrepresentation.
*1259 Section 157 Restatement (Second) Contracts (1981) states that a person otherwise entitled to relief is not necessarily barred therefrom because of negligence in failing to read the contract:
§ 157 Effect of Fault of Party Seeking Relief
A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
Plains Cotton Cooperative Ass'n v. Wolf, 553 S.W.2d 800, 803 (Tex.Civ.App. 1977), holds:
As a general proposition, equity will not act to rescind a contract where the mistake was induced by the negligence of the party seeking rescission. Commercial Standard Insurance Co. v. White, 423 S.W.2d 427 (Tex.Civ.App.  Amarillo 1967, writ ref'd n.r.e.). Furthermore, parties to an arms-length transaction are charged with a duty to read what they sign; failure to do so constitutes negligence. Thigpen v. Locke, 363 S.W.2d 247 (Tex. 1962); Jones v. Guilford Mortgage Co., [120 S.W.2d] 1081 (Tex.Civ. App.  Dallas 1938, no writ).
There is, however, an exception to the above stated rule. Where one party's false representations induce another party to contract, negligence of the second party cannot be raised to bar relief to him. Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808 (1888); Isenhower v. Bell, 365 S.W.2d 354 (Tex. 1963). Thus, failure to read a contract before signing it, although it may constitute negligence, will not bar equitable relief to one who has executed a contract in reliance upon false representations made to him by the other contracting party. Conn v. Hagan, 93 Tex. 334, 55 S.W. 323 (1900); Black v. Mosk Clothes Shop, 99 S.W.2d 343 (Tex. Civ.App.  Galveston 1936, no writ). This equitable rule applies whether rescission is sought under a fraud theory or a mistake theory. Conn v. Hagan, supra. Similarly, the rule operates on innocent as well as intentional misrepresentations. Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141 (1909); Citizens Standard Life Insurance Co. v. Muncy, 518 S.W.2d 391 (Tex.Civ.App.  Amarillo 1974, no writ). After reviewing the foregoing authorities, we have concluded that a party's own negligence should not bar him from seeking equitable relief from a contract executed in reliance upon the false representations of the other contracting party.
P.C.C.A. contends that only misrepresentations as to the contents of a written contract will excuse a party's negligence in not reading it. We do not agree that the rule is so limited. See, e.g., Labbe v. Corbett, supra; Southern States Life Insurance Company v. Newlon, 398 S.W.2d 622 (Tex.Civ.App.  Eastland 1966, writ ref'd n.r.e.).
Also: State Bank of La Crosse v. Elsen, 128 Wis.2d 508, 516-17, 383 N.W.2d 916, 920 (Wis.App. 1986); Wehner v. Schroeder, 354 N.W.2d 674, 678-679 (N.D. 1984).
We find that the statement of the Texas Court of Appeals in Plains Cotton Cooperative sound law, and accordingly hold that Huntington was not barred from relief because he failed to read the addendum to the specifications before signing the contract. Godfrey, as the senior member of a reputable professional architectural firm, the author of the contract and accompanying plans and specifications, made a representation upon which Huntington was entitled to rely, and in the absence of which Huntington would undoubtedly have read the addendum before submitting his bid. Huntington's negligence pales when compared to the negligence of the Godfrey firm in failing to make the planned correction of their specifications. Why did not Godfrey or Kuykendall read the addendum? They were its author. Moreover, Huntington's negligence resulted directly from Godfrey's misrepresentation. Huntington's negligent failure to read the addendum in this case was an omission that *1260 the trial court and jury were authorized to excuse.[4]
Godfrey finally jury assigns as error that the verdict of the jury is against the overwhelming weight of the evidence. We do not agree.
The judgment of the circuit court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] This clause can be further simplified by an example. A contractor puts in a bid for $100,000 on a building project which has a $5,000 "contingency" provision. If he runs into no unexpected problems and completes the job precisely in accordance with the plans and specifications, he is only paid $95,000. On the other hand, if the parties encounter unexpected expenses or conditions, this $5,000 contingency is expected to be spent on those.
[2] Architects know all the contractors interested in bidding, because when the public body advertises for bids, all contractors who desire to bid contact the architect and get copies of the plans and specifications. The contractor generally pays a deposit for his copies, and if not successful in his bid, returns the plans and specifications to the architect who in turn refunds the deposit.
[3] The following colloquy occurred during oral argument between the Court and counsel for Godfrey:

COURT: Mr., uh, Mr. Huntington actually didn't have that Addendum though, did he? Your client hadn't even sent it, had he?
MR. LOW: Your Honor, I believe  it didn't 
COURT: Was it  excuse me, go ahead.
MR. LOW: I'm sorry. I was just going  it would depend on how good the mails were. It was mailed out on the 20th, the day before the phone conversation. It went out in the mail. But I don't know whether Mr. Huntington received it on the 21st.
COURT: He  Mr. Huntington is  uh  knew that the original specifications contained that $9,000 and he's worried about it. And he wanted to be sure to get that clear in his head whether that $9,000 was going to be in or not going to be in this contract, because it was more than ten percent of his bid. That's why he wanted to get in touch with Mr. Godfrey to find out about that.
MR. LOW: I agree.
COURT: And then Mr. Godfrey told him that it was going to be omitted from  that's what the jury found?
MR. LOW: That's what the jury found.
COURT: All right. And, uh, as a matter of fact you  you've told us that really leaving the $9,000 in was unintentional on the part of the architectural firm. That would be rather unusual to leave a $9,000 contingency in a contract this small?
MR. LOW: I agree.
COURT: And the contract  and the architect really intended to take it out himself?
MR. LOW: I agree, Your Honor. There is no question here before this Court that my client made a mistake. And we're  we're  stand convicted by the jury of negligence. The issue is could Mr.  did Mr. Huntington reasonably rely or did he rely on it at all? And I submit that the uncontradicted proof in the record from Mr. Huntington's own mouth, and from his bid which he submitted demonstrates that he did not rely on that.
COURT: So, the phone call would have reminded your client to something about the $9,000 contingency, wouldn't it?
MR. LOW: Well, the problem with that, Your Honor, is unlike Mr. Huntington  Mr. Huntington it was  this was important to him, which again is the reason he should have read the document before he signed it  assuming he didn't.
COURT: I think it's clear the lawsuit is about you can't trust anybody  you've got to make them put it in writing and that's the law and that's fine. I don't see how you do business in the world that way, but you do. But didn't it remind your client to delete the $9,000 contingency?
MR. LOW: The problem with that, Your Honor, is Mr. Godfrey is the senior partner in the firm, but this was not his job. This job was being handled by Mr. Kuykendall, the junior partner in the firm. He's the one that came to the  that went to the bid opening the next day and he's the one who handled the job from thereon and he's the one who relied on Mr. Huntington when Mr. Huntington said in his bid I received this addendum. I don't know whether that answered Your Honor's question, but 
COURT: Yes, sir. Thank you.
[4] The propriety of holding the Godfrey firm liable can be simply illustrated. Suppose that precisely what occurred here happened to a firm of lawyers. The senior partner informed Huntington that the contract had been changed by an addendum. Through oversight a junior member failed to make the change. There would probably be a complaint to the State Bar if the firm did not make restitution for the loss caused by its own misrepresentation.

Architects are professionals, too.