[No. 54121-3.   En Banc.   July 14, 1988.]

DANA BROWN, ET AL, *Petitioners*, v. SHARON M. GIGER, *Respondent*.

*Gary W. East,* for petitioners.

*Johnson & Rutz,* by *David V. Johnson,* for respondent.

DURHAM, J.—Plaintiffs brought this action to recover moneys owed them by defendant under the terms of a promissory note. The trial court entered summary judgment for plaintiffs, but the Court of Appeals reversed, holding that defendant's debt must be offset by usury penalties. We reverse the Court of Appeals and reinstate the judgment of the trial court.

I

The facts are established by the depositions and affidavits accompanying the parties' cross motions for summary judgment. In the spring of 1983, defendant Sharon Giger borrowed $33,000 from the plaintiffs in this action, five married couples, through a lending broker, Consumer Loan Service (CLS). Giger pledged her vendor's interest in a real estate contract as collateral for the loan and agreed to pay interest at a rate of 16 percent per annum.

Giger borrowed the funds at the request of a friend, Neil Ebling, to whom she loaned the money so he and a partner could make a down payment on a mini–mart and restaurant business. Giger and Ebling claim that Giger was not a partner in the enterprise and that they never represented to CLS that they were partners, or that Giger had any business or investment purpose in loaning the money to Ebling.

The circumstances of Giger's loan application with CLS suggested to Richard Walker, vice president of CLS, that Giger was to be a partner in the mini–mart business, however. It was Ebling, and not Giger, who called CLS to arrange the loan. During that call, Walker claims, Ebling said that Giger would be a partner in the mini–mart venture. Moreover, Ebling accompanied Giger to the loan interview at CLS's offices.

Information Giger and Ebling provided to Walker at the loan interview also suggested Giger's involvement in the mini–mart venture. For one, all the loan proceeds were to be handed over to Ebling for investment in the venture. Additionally, the monthly payments on the loan were to

come from Ebling, presumably from profits generated by the mini–mart. Thus, Walker perceived Giger to be a backer even though she told him that she would have nothing to do with the venture.

Walker's perceptions found expression in the loan documents that CLS prepared for Giger's signature. The application states that the purpose of the loan is "Mini Mart in Jocye [sic], Washington". A standard–form "Customer Agreement", in which Giger agreed to pay CLS a service fee, says:

> For services performed by Consumer Loan Service of Lynnwood, Inc., in connection with the acquisition of a loan *exclusively for investment, business and/or commercial purposes for* Sharon M. Giger [handwritten] ("Customer"), the Customer hereby agrees to pay Consumer Loan Service . . . a fee . . .

(Italics ours.) An escrow agreement states: "This loan is for business purposes only and not for personal use. . . . This loan is for commercial Purposes only." Giger signed all of these documents. Ebling signed none of them, and thus was not an obligor on the loan, nor did he guarantee the loan.

Giger never saw the funds she borrowed through CLS, but immediately signed her loan check over to Ebling. Ebling then sent her money each month to cover her monthly payments, which began in May 1983. He had no formal contract with Giger however, and paid no interest to her for the use of the money.

In July 1983, Ebling was late with his payment. In January 1984, he was late again, and was continually late until he stopped making payments altogether in August 1984. Giger could not make the loan payments when Ebling failed to pay her, and thus defaulted on the loan when Ebling stopped sending her money in August.

Plaintiffs commenced this action on October 29, 1984, in Clark County Superior Court, seeking the $33,000 loan principal and interest at 16 percent accruing since July 28, 1984. They also requested a first lien on the property Giger had pledged as collateral, and attorney fees. Giger in her

answer admitted her obligation and her default, but alleged in defense that the loan was usurious, and counterclaimed for usury penalties, for damages under the Washington Consumer Protection Act, RCW 19.86, and for attorney fees. Replying and answering, plaintiffs contended that their loan with Giger was not usurious because it was exempt from the usury laws under the "business purpose" exemption in RCW 19.52.080. Plaintiffs also asserted that Giger's claim under the Consumer Protection Act is precluded by RCW 19.86.170 because CLS's activities are regulated under Washington securities law.

The parties filed cross motions for summary judgment and stipulated in open court that judgment could be rendered as a matter of law. The trial court granted the plaintiffs' motion, and denied Giger's. The trial court ruled that the loan was not usurious because it "was primarily for commercial and business purposes and is therefore exempt pursuant to RCW 19.52.080 from application of the Washington State Usury limitations . . ."

Giger appealed this ruling,[1] and the Court of Appeals reversed by a divided vote. *Brown v. Giger,* 48 Wn. App. 172, 738 P.2d 312, *review granted,* 108 Wn.2d 1030 (1987).

## II

Washington's usury statutes, like those of other states, are designed "to protect the needy borrower from the unconscionable moneylender" by prohibiting interest charges that exceed a statutory maximum. *Sparkman & McLean Co. v. Govan Inv. Trust,* 78 Wn.2d 584, 588, 478 P.2d 232 (1970). "The protection granted is based on the fact that many borrowers are powerless to resist the avarice of the money lenders." *Baske v. Russell,* 67 Wn.2d 268, 273, 407 P.2d 434 (1965).

Interest ceilings are not always beneficial, however. Because they limit the availability of credit for high risk

---

[1]Giger has not appealed the trial court's dismissal of her Consumer Protection Act claim.

enterprises, usury restrictions have been criticized as "purposeless control and restraint of businesses." Note, *Usury Legislation—Its Effects on the Economy and a Proposal for Reform,* 33 Vand. L. Rev. 199, 219 (1980). Nor are the restrictions always necessary. Corporations, banks and other financial institutions, as well as individual investors, being

> accustomed to financial operations and familiar with the worth of money in the market from day to day, might well be deemed to require no statutory protection against being forced by their financial necessities to pay excessive interest for moneys borrowed.

*Sparkman & McLean,* at 589 (quoting *Griffith v. Connecticut,* 218 U.S. 563, 570, 54 L. Ed. 1151, 31 S. Ct. 132 (1910)).

Washington's "business purpose" usury exemption, RCW 19.52.080, is responsive to these observations. Since its enactment in 1969, the exemption has removed the constraints of the usury restrictions from a steadily broadening class of financial transactions. Until 1975, the exemption denied the defense of usury to certain entities and persons "in the business of lending money or the development or improvement of real estate". Laws of 1969, 1st Ex. Sess., ch. 142, § 1, p. 1039; Laws of 1970, 1st Ex. Sess., ch. 97, § 2, p. 762. From 1975 to 1981, the exemption applied to an expanded group of entities and persons with respect to transactions of $50,000 or more made "exclusively for commercial or business purposes". Laws of 1975, 1st Ex. Sess., ch. 180, § 1, p. 616. And since 1981, still more entities fall within the scope of the exemption, and exempt transactions are now those of any amount made "primarily for agricultural, commercial, investment, or business purposes". RCW 19.52.080.

We discern in this steady withdrawal of the usury restraints the Legislature's intent to limit application of the usury laws to those situations in which the statutory restrictions are most urgently required. The evil at which

the usury laws are aimed, as we have said, is oppression of the borrower "who by adversity and necessity of economic life [is] driven to borrow money at any cost." *Baske,* at 273. One who incurs a debt "primarily for agricultural, commercial, investment, or business purposes", RCW 19.52.080, is not subject to such oppression, as he does not borrow out of "adversity and necessity of economic life". Thus, RCW 19.52.080 denies to this person the protections against usury.

The exemption is not a meanspirited one, however. Its purpose is positive: to free up credit for those whose ventures could not be financed at below–usury rates. Enacted and expanded during a time of rising interest rates and increasing criticisms of usury restrictions, the "business purpose" exemption functions as an "escape valve—something that would relieve the adverse pressure which the usury laws were exerting on legitimate commercial activities." Shanks, *Practical Problems in the Application of Archaic Usury Statutes,* 53 Va. L. Rev. 327, 347 (1967).

### III

The determinative issue in this case is the proper characterization of the purpose for Giger's loan transaction. The trial court and the dissenting judge in the Court of Appeals characterized that purpose as primarily business or investment in nature. The majority in the Court of Appeals thought the transaction "more properly characterized as personal in nature." *Brown,* at 176.

The Court of Appeals accords great significance to Giger's subjective purpose in taking out the loan. The court apparently was persuaded by Giger's and Ebling's statements that Giger never sought a business or investment gain from Ebling's use of the loan money.

> Here, it is undisputed that Giger's specific intended use of the funds was to loan them to a friend, at no interest, at no business advantage to herself. It is undisputed that she had no pecuniary interest in Ebling's subsequent business use of the funds. She expected no

profit. Her specific purpose was therefore personal in nature.

*Brown,* at 177.

■ While subjective purpose may have a place in some aspects of lending law, *see* R. Rohner & F. Miller, *Truth in Lending* ¶ 2.04 (Supp. 1986), we do not think it is generally determinative of a transaction's "purpose" within the meaning of RCW 19.52.080. Washington cases consistently have noted the importance of objective indications of purpose in determining the applicability of the "business purpose" exemption.

In *Aetna Fin. Co. v. Darwin,* 38 Wn. App. 921, 691 P.2d 581, (1984), *review denied,* 103 Wn.2d 1019 (1985), for example, the court was asked to characterize the purpose of a loan requested to finance the purchase of a commercial truck and trailer. The court approached the problem by looking at "the use to which the borrower intended to put the loan proceeds at the inception of the loan contract." *Aetna,* at 927. The borrower's intended use, in turn, was characterized "according to the manifestations of intent, if any, that the borrower made to the lender at the time the parties entered into the loan contract." *Aetna,* at 927.

We fully concur with the *Aetna* court that a loan's "purpose" in the context of RCW 19.52.080 is principally established by the representations the borrower makes to the lender at the time the loan is procured. In this case, Giger never made clear to CLS that she would have no business or investment interest in Ebling's venture. Ebling's active involvement in arranging the loan interview, and his presence at the interview, suggested that he and Giger were partners in the venture, and plaintiffs' agent, Walker, reasonably so concluded.

More conclusive are the loan documents themselves. In at least three separate places, Giger's loan is described as having a business or commercial purpose. Though she may not have drafted these documents, Giger signed them,

thereby representing that she sought funding for the purposes stated. *See Conrad v. Smith,* 42 Wn. App. 559, 712 P.2d 866, *review denied,* 105 Wn.2d 1017 (1986).

This is not to say that objective manifestations of purpose are always determinative of the applicability of the "business purpose" exemption. Courts will not deny a borrower his protections against usury when a lender manipulates a loan's structure so as to evade usury restrictions. *See Aetna,* at 928; *cf. Gelber v. Kugel's Tavern, Inc.,* 10 N.J. 191, 89 A.2d 654 (1952). Thus, where it appears that the objective evidence of a loan's purpose has been "rigged" by the lender, further scrutiny into the borrower's actual purpose in obtaining the funds may be necessary. We are not faced with this situation here, however. Moreover, nothing suggests that Giger was "by adversity and necessity . . . driven to borrow money at any cost." *Baske,* at 273. She did not need the money she borrowed and, in fact, never personally controlled or expended it in any way.

## IV

In concluding, we offer a few additional observations. We have no doubt that paying off the loan will be a hardship to Giger. But we do not find plaintiffs blameworthy for that hardship. Plaintiffs' agent did all that he was required to do under the law to comply with the usury statutes. He ascertained that Giger had a business purpose in obtaining the loan and, as the loan's default attests, justifiably charged her above–usury interest to compensate for the unique risks of Ebling's mini–mart venture.

The fault for Giger's predicament, we sadly must point out, is her own. Giger is a college graduate. Yet, the record reveals Giger's naive trust in Ebling, and her altogether–too–casual willingness to endorse the lending broker's characterization of her loan. We have stressed before the strength of the commitments that arise from the making of legal contracts, and our reluctance to forgive them when a party has carelessly "sold the farm." *See, e.g., Skagit State Bank v. Rasmussen,* 109 Wn.2d 377, 745 P.2d 37 (1987).

We must emphasize again the duty of each individual to be vigilant when undertaking contractual obligations.

The decision of the Court of Appeals is reversed, and the judgment of the trial court reinstated. Plaintiffs are entitled to an award of attorney fees for the proceedings in the Court of Appeals, but may not be reimbursed for fees incurred in connection with the proceedings before this court because they have failed to comply with RAP 18.1.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

DORE, J. (dissenting)—I dissent.

The majority argues that Giger had a business purpose in obtaining her loan because it has not been unequivocally established that she had a personal purpose. I dissent because, in reaching this conclusion, the majority improperly decides an issue of fact. Even if we are entitled to decide the issue, the majority improperly shifts the burden of proof. Finally, even if a question of law rather than of fact is presented, the majority's construction of RCW 19.52.080 is erroneous.

### PROCEDURAL POSTURE AND THE PROPER STANDARD OF REVIEW

This case is before us on cross motions for summary judgment. The trial court entered judgment in favor of the lender on its motion, having determined that the exception to the usury statute does apply to the loan in question. The Court of Appeals reversed on the ground that the exception does not apply, in effect granting Giger's cross motion for summary judgment. I would reverse this case and remand it for trial because summary judgment is not proper at all.

In granting summary judgment, the trial court necessarily determined that no disputed facts were in issue. This determination was based on a stipulation of the parties, entered into at the trial court's urging, that the application of the business purpose exception was "solely an issue of

law." Report of Proceedings, at 2. That purported stipulation is not binding on this court and it does not correctly describe the issues in this case.

The determination that a given issue should be decided by the court or by the jury is clearly always made by the court. Therefore, while the parties are free to stipulate to issues of fact, whether or not a given issue is one of fact or of law is itself an issue of law. This court is not bound by stipulations of law. *Rusan's, Inc. v. State,* 78 Wn.2d 601, 606, 478 P.2d 724 (1970). We are free to conclude, despite the parties' stipulation, that whether or not the business purpose exception of RCW 19.52.080 applies to this loan is an issue of fact.

The majority's discussion of the case makes it quite clear that this case does present disputed issues of fact and that summary judgment is therefore not appropriate at all. As argued below, questions of credibility concerning who said what to whom are dispositive. Even if the parties might be content to waive their rights to a jury, this appeals court is incapable of making determinations of credibility on the record alone. The issues presented here are clearly factual issues and normal standards appropriate to determinations of fact on summary judgment therefore apply.

### THE RECORD PRESENTS A JURY QUESTION

In reviewing a denial or grant of summary judgment, we apply the same standard as a trial court: construing the evidence in the light most favorable to the nonmoving party, we ask whether a reasonable jury could find in favor of that party. The motion is granted if the answer is no. Put another way, the moving party is entitled to prevail as a matter of law if no reasonable person could conclude that he should not prevail. *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 153, 570 P.2d 438 (1977). We do not, of course, weigh evidence. Nevertheless, much of the majority opinion does. The majority notes that:

> Giger and Ebling claim that Giger was not a partner in the enterprise and that they never represented to CLS

that they were partners, or that Giger had any business or investment purpose in loaning the money to Ebling. Majority, at 77. There was a dispute about this however, which the majority frankly acknowledges:

During that call, Walker claims, Ebling said that Giger would be a partner in the mini–mart venture.

Majority, at 77. Was Giger represented to be a partner or not? We cannot decide that question. We cannot evaluate the credibility of Giger, Ebling and Walker. Whether Giger was represented to be a partner or not is a classic jury question. Yet in holding for the lender, the majority decides that issue.

Similarly the majority argues:

Information Giger and Ebling provided to Walker at the loan interview also suggested Giger's involvement in the mini–mart venture. For one, all the loan proceeds were to be handed over to Ebling for investment in the venture. Additionally, the monthly payments on the loan were to come from Ebling, presumably from profits generated by the mini–mart. Thus, Walker perceived Giger to be a backer even though she told him that she would have nothing to do with the venture.

Majority, at 77–78. We do not have the authority or the means to determine what Walker perceived. Even if we did, Walker's view of the transaction is only half the equation; a jury would have to decide whether that perception was correct or justified. As the majority concedes, Giger told Walker "that she would have nothing to do with the venture." Was Walker justified in disregarding that disclaimer? Did that disclaimer mean only that Giger was to be a silent partner? If we interpret the disclaimer that way, should we believe Ebling and Giger that they did not represent her as a partner at all, or should we believe Walker that Giger was represented to be a partner?

We cannot and should not answer those questions. This case is before us on summary judgment. If the evidence is in conflict, as the majority opinion suggests, then the case should go to the jury.

### The Lender Cannot Meet His Burden
### of Proof

Even if we were capable of deciding this issue of fact, the lender would not be entitled to judgment. We must keep in mind that RCW 19.52.080 is intended for the protection of borrowers, not banks. The burden is on the lender to establish that the borrower had a business or investment purpose. *Aetna Fin. Co. v. Darwin,* 38 Wn. App. 921, 924–25, 691 P.2d 581 (1984), *review denied,* 103 Wn.2d 1019 (1985). If the facts show only that Giger's purpose was not clear at the time the loan was made, the lender cannot meet his burden of proof and the borrower is entitled to judgment.

The majority argues that the loan documents establish that the purpose of the loan was business or investment. However, the loan documents are not decisive, or even relevant. The leading case on RCW 19.52.080, as the majority recognizes, is *Darwin.* In a well reasoned opinion, Judge Reed wrote:

> The borrower's intended use for the loan proceeds must be characterized according to the manifestations of intent, if any, that the borrower made to the lender at the time the parties entered into the loan contract. *See National Bank of Commerce v. Thomsen,* 80 Wn.2d [406,] 410, 415 [495 P.2d 332 (1972)]; *Janzen v. Phillips,* 73 Wn.2d 174, 178, 437 P.2d 189 (1968). However, a borrower's acquiescence in a scheme to avoid the usury law does not make the transaction qualify for the exemption in RCW 19.52.080.

*Darwin,* at 927–28. This makes sense. A lender eager to grant, and a borrower eager to receive, an illegal loan can be expected to conceal a nonbusiness purpose. Consequently, a fact finder examining the transaction should look only at the express intentions of the borrower at the inception of the transaction and not at "facts" and recitals that may well constitute an evasion of the usury law.

Contrary to the majority's assumption, therefore, *Darwin* does not state a totality of the circumstances test. The totality of the circumstances might well include a number

of things by which the lender, with the acquiescence of the borrower, has concealed a nonbusiness purpose. Clearly one of the easiest ways to do this would be to recite a business or investment purpose in the loan documents. Under *Darwin,* the loan documents have no bearing on the case. Instead, we should look only to the statements of intent actually made by Giger.

Based on that evidence, the lender is clearly not entitled to judgment. As the majority concedes, Giger expressly disclaimed a business purpose in her meeting with Richard Walker, the lender's representative. She was never asked whether she had an investment purpose. Walker testified at his deposition as follows:

Q. When you use the term "backer," [in reference to Giger] what does that mean?
A. She was supplying the money.
Q. Did you discuss whether she was going to receive any share of the profits?
A. That is none of my business.
    MR. EAST: The answer is no?
    THE WITNESS: No.
    MR. EAST: Let's keep the answers to the question.
Q. Did you ask her about this, about what role she was going to be playing in the business?
A. Yes.
Q. Do you recall that conversation, what you asked her and what she answered in general?
A. I asked who was going to be active in the business. Neil was going to be active in the business. I had asked Sharon if she was going to be active in the business and she said no.
Q. Do you recall asking her what was in it for her or something to that [e]ffect?
A. No.

Deposition of Richard D. Walker, at 15–16. Giger's testimony is consistent with Walker's.

Q. Do you specifically recall anything that was said by you or by Mr. Ebling to Mr. Walker as for the reason for this loan?
A. I remember being asked what my part in this would be.

Q. Your part in what?
A. In the business.
Q. In the mini–mart?
A. Yes.
Q. The mini–mart was discussed?
A. Yes. And, the restaurant, the combination.
Q. What did you say in response to that?
A. I remember being embarrassed and saying nothing. I had nothing to do with it.

Deposition of Sharon Giger, at 21–22. She also testified:

Q. What specifically did you tell Mr. Walker the purpose of this loan was?
A. I didn't say. He asked what I was going to do in this business, and I said "nothing."
Q. That's all that was said?
A. That I can remember. I remember being embarrassed.
Q. Why were you embarrassed?
A. To make [sic] a loan and not have anything to do with it.

Deposition of Sharon Giger, at 43.

On this evidence, the lender has failed to meet his burden of proof and any fact finder would be obliged to conclude that Giger did not have a business purpose. At best, Giger's purpose was unclear. It is undisputed that the only expression of purpose Giger made was to deny involvement in the business. She had no investment purpose because she did not receive profits as a silent partner or even interest on the money she lent to Ebling. The majority asserts that Giger never had control of the loan proceeds because she endorsed the loan check over to Ebling. Just the opposite conclusion follows from that endorsement: it is itself an absolute exercise of control over the loan funds. Giger turned the money over to her friend, without expectation of gain, as an act of friendship. That is not only an exercise of control, it is a use of the loan for a nonbusiness, noninvestment purpose. Therefore, even if this court were entitled to decide the issue of fact presented here, Giger, not the lender, would be entitled to judgment.

## Ambiguity as to Purpose Must Be Construed Against the Lender

The same conclusion follows even if this court accepts the parties' purported stipulation that only an issue of law is presented. The majority opinion, apparently accepting that premise, frames the issue of law this way: since Giger did not make a nonbusiness purpose clear to the lender at the time the loan was made,[2] is the lender entitled to judgment on that basis? The majority answers yes. The correct answer is no. If the borrower's purpose is unclear, that ambiguity must be construed against the lender, both because he has the burden of proof on the issue of purpose and because any other rule would open the door to evasion of the usury statute by intentional ambiguity on the subject of borrowers' purposes.

Walker testified that he did not ask Giger any questions about the purpose of her loan because he considered it "none of my business." On the contrary, it clearly was his business to find out whether Giger was to receive profit from this venture. A lender cannot be permitted to leave the purpose of a loan in an ambiguous state; he has the burden of clarifying the matter. Any other rule would leave the door wide open to evasions of the usury statute by purposeful ambiguity. If we construe an ambiguous transaction against the borrower, we invite lenders to avoid the usury statute by asking as little as possible about the purposes of loans they suspect to be personal in nature. That method of evading the usury statute would harm both lenders and borrowers.

Therefore, even if we accept the parties' purported stipulation that only a question of law is presented, the majority decides the case on a patently erroneous construction of RCW 19.52.080. If the facts are ambiguous, that ambiguity should be construed against the lender, and we should

---

[2]This appeals court considers only undisputed facts. The undisputed facts establish, at best, that Giger did not make a nonbusiness purpose clear to the lender at the time the loan was made.

grant judgment to the borrower. If Giger's purpose was unclear to the lender, she is entitled to judgment because the lender has the duty of establishing what the borrower's purpose is.

## CONCLUSION

As the subject record presents disputed issues of fact, summary judgment should be set aside, and the case remanded to the trial court for trial.