*The Court of Appeals*
of the
*State of Washington*
*Seattle*

RICHARD D. JOHNSON,
*Court Administrator/Clerk*

DIVISION I
One Union Square
600 University Street
98101-4170
(206) 464-7750
TDD: (206) 587-5505

March 30, 2015

Richard Llewelyn Jones
Kovac & Jones, PLLC
1750 112th Ave NE Ste D151
Bellevue, WA, 98004-3768
rlj@kovacandjones.com

Richard B Sanders
Goodstein Law Group
501 S G St
Tacoma, WA, 98405-4715
rsanders@goodsteinlaw.com

Brian Matthew King
Davies Pearson PC
920 Fawcett
PO Box 1657
Tacoma, WA, 98401-1657
bking@dpearson.com

Gary Michael Abolofia
Attorney at Law
3518 142nd Pl NE
Bellevue, WA, 98007-3232
gma_law@hotmail.com

Ingrid Linnea Daun McLeod
Davies Pearson, P.C.
PO Box 1657
Tacoma, WA, 98401-1657
imcleod@dpearson.com

CASE #: 71148-2-I
Penny Arneson, Appellant v. Gary Nordlund, Respondent

King County, Cause No. 12-2-01170-2.SEA

Counsel:

Enclosed is a copy of the opinion filed in the above-referenced appeal which states in part:

"Affirmed in part, reversed in part, and remanded."

Counsel may file a motion for reconsideration within 20 days of filing this opinion pursuant to RAP 12.4(b). If counsel does not wish to file a motion for reconsideration but does wish to seek review by the Supreme Court, RAP 13.4(a) provides that if no motion for reconsideration is made, a petition for review must be filed in this court within 30 days. The Supreme Court has determined that a filing fee of $200 is required.

In accordance with RAP 14.4(a), a claim for costs by the prevailing party must be supported by a cost bill filed and served within ten days after the filing of this opinion, or claim for costs will be deemed waived.

Should counsel desire the opinion to be published by the Reporter of Decisions, a motion to publish should be served and filed within 20 days of the date of filing the opinion, as provided by RAP 12.3 (e).

Sincerely,

Richard D. Johnson
Court Administrator/Clerk

jh

Enclosure

c:    The Honorable Richard Eadie



STATE OF WASHINGTON

2015 MAR 30 A 10: 30

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PENNY ARNESON fka PENNY ARNESON SWEET, on behalf of herself personally and on behalf of The 6708 Tolt Highlands Personal Residence Trust, | DIVISION ONE |
| | No. 71148-2-I |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| GARY NORDLUND and ALDENTE, LLC, | |
| Respondents, | |
| MFE, LLC; COLUMBIA NORTH WEST MORTGAGE; MARK D. FLYNN; L80 COLLECTIONS, LLC; MCGAVICK GRAVES, P.S.; and DOE DEFENDANTS 1 through 20, inclusive, | |
| Defendants. | FILED: March 30, 2015 |

DWYER, J. — The 6708 Tolt Highlands Personal Residence Trust obtained loans from Aldente, LLC and Gary Nordlund in 2009 and 2010, respectively. This lawsuit, brought by Penny Arneson, one of the trustors of the Trust and one of two co-trustees at the time of the loans, is related to these loan transactions. Arneson asserts claims, both in her individual capacity and as co-trustee, pursuant to the Consumer Loan Act and the usury act, alleging that the lenders were not licensed to make the loans and that the loan interest rates exceeded rates allowed by statute. In separate orders, the trial court granted summary judgment in favor of each lender. Arneson appealed from each order. As

concerns the claims of the Trust, we reverse both of them. As concerns Arneson's individual claims, we affirm each of them.

I

Arneson and her then-husband, Kenneth Sweet, established the 6708 Tolt Highlands Personal Residence Trust on October 31, 2006.[1] From its formation, Arneson and Sweet were both trustors and trustees of the Trust. The sole beneficiary of the Trust was another entity, the Rose Adorer Family Limited Partnership (the Partnership). Additionally, the Trust instrument granted Arneson and Sweet the discretion to designate additional beneficiaries of the Trust, so long as the additional designated beneficiary was one of their children or grandchildren. The trust instrument did not grant Arneson and Sweet the authority to designate themselves as trust beneficiaries.

The trust instrument did grant Arneson and Sweet broad discretionary powers in their capacities as trustees, including borrowing and encumbrance powers.

> The Trustees may borrow money upon such terms and conditions as it shall deem advisable . . . .
>
> The Trustees shall have the power to obligate the trust property for the repayment of any sums borrowed where the best interests of the beneficiaries have been taken into consideration.
>
> The Trustees shall have the power to encumber the trust property, in whole or in part, by a mortgage or mortgages, deeds of trust, or by pledge, hypothecation or otherwise, even though such encumbrance may continue to be effective after the term of any trust or trusts created in this agreement.

---

[1] The parties dispute whether the trust is irrevocable or testamentary. This dispute is of no moment here.

These discretionary powers were required to "be exercised by the Trustees solely in a fiduciary capacity and subject always to the Trustees' fiduciary obligations."

Shortly after the Trust's formation, third party sellers conveyed title to real property located at 6708 Highlands Road NE in Carnation, Washington (the Property) directly to the Trust. Although the Trust was officially named the "6708 Tolt Highlands Personal Residence Trust," the Trust instrument makes no other reference to the Property. Moreover, the Trust instrument makes no provision for Arneson or Sweet to occupy the Property. Nonetheless, Arneson, Sweet, and their children apparently did occupy the Property.

In 2009, Sweet was arrested on suspicion of sexually abusing one of Arneson's children.[2] Arneson filed for divorce immediately after Sweet's arrest.[3] This turmoil was the backdrop for the loans at the center of this case.

In May of 2009, Sweet arranged for a loan through Aldente, LLC (Aldente) in the amount of $200,000.00. The loan was approved by the superior court and was to be secured by a deed of trust against the subject Property. The proceeds of the loan were to be used to pay living expenses, spousal maintenance, child support, taxes, divorce and criminal lawyers, and other family expenses.

On May 19, 2009, the loan with Aldente closed. According to the loan agreement, "The purpose of the loan is for a cash-out refinance of the real property owned by Borrower." The loan documents included a promissory note, which obligated the Trust, with Arneson and Sweet as guarantors, to repay the

---

[2] Sweet was subsequently convicted of various felony charges arising from his misconduct. See State v. Sweet, King County Superior Court No. 09-1-06102-1 SEA.
[3] In re Marriage of Sweet, King County Superior Court No. 09-3-01590-6 SEA.

- 3 -

sum of $200,000.00 at the rate of 10 percent per annum and to be paid in full on or before November 1, 2010. The closing of the Aldente loan is evidenced by a HUD-I settlement statement. According to entries on this form, in addition to the 10 percent interest rate called for in the promissory note, Aldente received an additional "loan fee" of 3 percent, thus making the effective interest rate 13 percent. Arneson alleges that additional "loan payments" were withheld as well.

In January of 2010, Sweet arranged for a second loan, this from Nordlund, in the amount of $375,000.00. Sweet arranged for this loan with the assistance of mortgage broker Mark Flynn, who was an acquaintance of Nordlund and who approached Nordlund regarding loaning funds to the Trust. This loan was also approved by the superior court, in orders dated October 15, 2009, November 17, 2009, and January 13, 2010. Repayment of this loan was to be secured by a deed of trust against the subject Property. The proceeds of the loan were to be used to satisfy the Aldente loan and fund various of Sweet's personal expenses.

On January 15, 2010, the Nordlund loan closed. The loan documents included a promissory note, whereby the Trust was obligated to repay the sum of $375,000.00 at the rate of 12 percent per annum and to be paid in full on or before January 15, 2011. The promissory note states that the "sums represented by [the] Note are being used for business, investment or commercial proposes, and not for personal, family or household purposes." Arneson and Sweet separately initialed this provision. The closing of the Nordlund loan is evidenced by a HUD-I settlement statement. According to entries on this form, in addition to the 12 percent interest rate called for in the promissory note, charges for making

- 4 -

the loan added an additional "loan fee" of 16 percent. Also according to entries on this form, Sweet's divorce lawyer and his criminal defense lawyer were paid directly from escrow, as was a parenting evaluator. The balance of the funds, to the "borrower," was paid directly to Sweet. Nordlund would have had to approve these disbursements through escrow instructions.

On January 19, 2011, the superior court in the Arneson and Sweet dissolution action entered a decree of dissolution that provided "[t]he real properties awarded to wife are held in the 6708 Tolt Highlands Personal Residence Trust . . . . In addition to [the real property held by the Trust,] the following other entit[y is] also awarded to wife: Rose Adorer Family Limited Partnership (NY)."

All principal and interest accrued were due in full on the Nordlund loan on January 15, 2011. After the Trust failed to fulfill its obligation on the loan, Nordlund made a demand on Arneson for payment of the Trust's loan. When the Trust still had not fulfilled its loan obligations to Nordlund by August 2011—nearly eight months after all principal and interest were due in full—Nordlund issued a notice of default to the Trust. Nordlund issued an amended notice of default for the Trust's debt, plus attorney fees and costs, in September 2011 and, eventually, a successor trustee to the deed of trust provided the Trust with notice of foreclosure under chapter RCW 61.24 and recorded a notice of trustee's sale.

The trustee's sale of the Property was scheduled to occur on February 3, 2012. Shortly before the sale, Arneson filed this lawsuit seeking to enjoin the trustee's sale of the Property and recover damages. In her amended complaint,

Arneson alleged violations of the Consumer Loan Act, the usury act, the Consumer Protection Act, the deeds of trust act, and asserted common law claims for intentional or negligent misrepresentation. The trial court granted Arneson's request for a preliminary injunction and, thus, the trustee's sale of the Property scheduled for February 3, 2012 was cancelled. Instead, the Trust was ordered to proceed with marketing and selling the Property and to deposit the sale proceeds into the court registry.

In support of her claims for recovery, Arneson argued that she and her husband, rather than the Trust, were the true owners of the Property and that the Trust's loans from Aldente and Nordlund were really personal, consumer loans to her and Sweet in their individual capacities and not commercial loans to the Trust. Arneson further argued that she was the true borrower and personally liable on the promissory note conveyed to Nordlund. In advancing these claims, Arneson relied extensively on terminology used by the superior court in the dissolution of marriage action between her and Sweet.

Aldente and Nordlund each moved for summary judgment, arguing both that Arneson lacked standing to bring the action in her individual capacity because she was not individually a party to either loan transaction, and that the Trust's claims against them must fail because the underlying loans to the Trust were business loans and, as such, were exempt from the usury statutes and the Consumer Loan Act. The trial court agreed and granted each defendant's motion for summary judgment, dismissing the claims against them.

Based on the provision in the promissory note requiring the Trust to pay Nordlund's costs and attorney fees, the trial court also entered judgment in favor of Nordlund and against the Trust in the sum of: (1) $375,000 in unpaid principal, (2) $193,263.43 in prejudgment interest accruing from the Trust's default on January 16, 2011 at the default rate specified in the promissory note, (3) $29,955.50 in attorney fees, and (4) $6,152.79 in costs. Because, during the pendency of Arneson's action, the Trust had sold the Property and deposited the proceeds from that sale into the court's registry, the court ordered the clerk of court to disburse funds from the registry so as to satisfy Nordlund's judgment against the Trust. Thus, Nordlund's judgment against the Trust was paid in full. The remaining proceeds from the Trust's sale of the Property were distributed from the registry to the Trust through its counsel.

II

Arneson alleged a cause of action pursuant to the Consumer Protection Act (CPA), chapter 19.86 RCW. This cause of action is premised (at least in part) upon alleged violations of two other statutes: the Consumer Loan Act (CLA), chapter 31.04 RCW, and the usury act, chapter 19.52 RCW. A violation of either statute constitutes a per se violation of the CPA. See RCW 19.52.036; RCW 31.04.208.

A

The CLA has been frequently amended since its 1991 enactment. Indeed, different versions of the CLA—neither of which was cited by the parties in their briefing to us—apply to the two loans at issue herein.

The following statutory provisions applied to the May 19, 2009 Aldente loan. Pursuant to former RCW 31.04.035 (2008), entitled "License required," anyone engaged in the business of loaning money was required to maintain a CLA license: "No person[4] may engage in the business of making secured or unsecured loans of money, credit, or things in action without first obtaining and maintaining a license in accordance with this chapter."[5] Another provision listed exceptions to the licensing requirement for certain entities or types of loans.

> This chapter shall not apply to any person doing business under and as permitted by any law of this state or of the United States relating to banks, savings banks, trust companies, savings and loan or building and loan associations, or credit unions, nor to any pawnbroking business lawfully transacted under and as permitted by any law of this state regulating pawnbrokers, nor to any loan of credit made pursuant to a credit card plan.

---

[4] "'Person' includes individuals, partnerships, associations, limited liability companies, limited liability partnerships, trusts, corporations, and all other legal entities." Former RCW 31.04.015(1) (2008).

[5] This provision had been amended in 2008. Prior to that amendment, the licensing requirement applied only to those engaged in making loans "at interest rates authorized by [the CLA]." Former RCW 31.04.035 (1991). The CLA permitted licensees to "[l]end money at a rate that does not exceed twenty-five percent per annum." Former RCW 31.04.105 (2008). By contrast, the highest rate generally permitted under the usury statute was 12 percent. Former RCW 19.52.020 (2008). Thus, under the 1991 version of the statute, a license was generally required only to facilitate loans bearing interest rates between 12 and 25 percent.

In 2009, in response to the 2008 amendments to the CLA, the agency charged with administering and interpreting the CLA, the Department of Financial Institutions, adopted regulations that hewed to the prior statutory language by indicating that the CLA licensing requirement applied only to those engaged in the business of loaning money at rates above the rates permitted by the usury act. See former WAC 208-620-230 (2009). However, "[a]n administrative agency . . . cannot modify or amend a statute by regulation." Bird-Johnson Corp. v. Dana Corp., 119 Wn.2d 423, 428, 833 P.2d 375 (1992). These regulations were contrary to the plain meaning of the statute as amended and, therefore, were invalid. Unsurprisingly, the agency changed tack soon thereafter, and regulations that became effective in 2010 reflect the general licensing requirement dictated by the 2008 legislative amendments.

In the 2009 regulations, the agency also improperly modified the CLA by limiting the definition of "borrower" to "any natural person." See former WAC 208-620-010 (2009). However, by defining "borrower" as "any person . . ." and "person" to include "individuals, partnerships, associations, . . . trusts, corporations, and all other legal entities," RCW 31.04.015, the legislature had made the meaning of borrower plain. Accordingly, the agency was without authority to interpret the statute to mean otherwise. Again, unsurprisingly, the agency has since changed this definition and it is no longer limited to natural persons. See former WAC 208-620-011 (2014).

Former RCW 31.04.025 (2008). There was also an exception for retail installment contracts made under the authority of chapter 63.14 RCW. See former RCW 31.04.025 (2008).

Thus, when the Aldente loan was made, anyone in the business of loaning money who did not qualify for one of the exceptions listed in the statute was required to hold a CLA license. Given that there is no dispute that Aldente did not hold a license at the time it made the relevant loan to the Trust, the sole remaining question is whether Aldente was engaged in the business of making qualifying loans at the time.

The CLA was amended once again prior to the January 15, 2010 Nordlund loan. These amendments changed the statute in two material ways. First, the interplay between RCW 31.04.025 and RCW 31.04.035 was made explicit—specifically, that RCW 31.04.025 lists exceptions to the general licensing requirement contained in RCW 31.04.035. The amended statute provided:

> No person may engage in the business of making secured or unsecured loans of money, credit, or things in action without first obtaining and maintaining a license in accordance with this chapter, except those exempt under RCW 31.04.025.

Former RCW 31.04.035 (2009). Thus, the only entities exempted from the CLA licensing requirement were those exempted by RCW 31.04.025.

RCW 31.04.025 was also amended. Those entities that had been exempt under the previous iteration of the statute remained exempt and new exemptions were added. These included an exemption for: "[a]ny person making loans primarily for business, commercial, or agricultural purposes, or making loans

made to government or government agencies or instrumentalities, or to organizations as defined in the federal truth in lending act." Former RCW 31.04.025(e) (2009).

As with Aldente, there is no dispute that Nordlund did not hold a CLA license. However, in his case, there are two relevant questions: first, whether Nordlund was engaged in the business of making qualifying loans, and, second, whether the loan at issue was a consumer transaction or, as contended by Nordlund, a business transaction.

B

Unlike the CLA, the same provisions of the usury statute apply to both of the loans made by Aldente and Nordlund, respectively.

Interest rates above 12 percent are generally usurious: "(1) Any rate of interest shall be legal so long as the rate of interest does not exceed . . . : (a) Twelve percent per annum." RCW 19.52.020.[6]

The act includes an exception for loans to certain entities, including trusts. However, the exception does not apply to consumer transactions.

> Profit and nonprofit corporations, Massachusetts trusts, associations, *trusts*, general partnerships, joint ventures, limited partnerships, and governments and governmental subdivisions, agencies, or instrumentalities may not plead the defense of usury nor maintain any action thereon or therefor. . . : PROVIDED,

---

[6] To be more specific, the usury act permits any rate of interest so long as it does not exceed the higher of 12 percent or
> (b) four percentage points above the equivalent coupon issue yield (as published by the Board of Governors of the Federal Reserve System) of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the later of (i) the establishment of the interest rate by written agreement of the parties to the contract, or (ii) any adjustment in the interest rate in the case of a written agreement permitting an adjustment in the interest rate.

RCW 19.52.020(1)(b).

HOWEVER, That this section shall not apply to a consumer transaction of any amount.

RCW 19.52.080 (emphasis added). Consumer transactions are "transactions primarily for personal, family, or household purposes." RCW 19.52.080. A consumer transaction is contrasted with a transaction "primarily for agricultural, commercial, investment, or business purposes." RCW 19.52.080.

The effective interest rate on each of the loans is not here at issue. Neither Aldente nor Nordlund presently disputes that the interest rate on the loans at issue exceeded the highest rate generally permitted. Instead, the relevant concern for each loan is whether the loan was a consumer transaction and, thus, subject to the provisions of the usury statute, or a business transaction and, therefore, excepted therefrom.

### III

Both defendants prevailed on summary judgment. We review a grant of summary judgment de novo. Lokan & Assocs., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Am. Express Centurion Bank v. Stratman, 172 Wn. App. 667, 673, 292 P.3d 128 (2012). We consider the evidence and the reasonable inferences therefrom in the light most favorable to the nonmoving party. Stratman, 172 Wn. App. at 673. A genuine issue of material fact exists where reasonable minds could differ regarding the facts controlling the outcome of the litigation. Parks v. Fink, 173 Wn. App. 366, 374, 293 P.3d 1275 (2013).

"A trial court's obligation to follow the law remains the same regardless of the arguments raised by the parties before it." State v. Quismundo, 164 Wn.2d 499, 505-06, 192 P.3d 342 (2008). It is our duty to apply the correct version of a statute, even if that version of the statute was not cited below. Chmela v. Dep't of Motor Vehicles, 88 Wn.2d 385, 393, 561 P.2d 1085 (1977).

> Courts should not be confined by the issues framed or theories advanced by the parties if the parties ignore the mandate of a statute or an established precedent. A case brought before this court should be governed by the applicable law even though the attorneys representing the parties are unable or unwilling to argue it.

Maynard Inv. Co. v. McCann, 77 Wn.2d 616, 623, 465 P.2d 657 (1970); accord In re Dependency of G.C.B., 73 Wn. App. 708, 717, 870 P.2d 1037 (1994) ("Although neither party brought this statute to our attention, it is the duty of an appellate court to apply a dispositive statute to the undisputed facts of a case notwithstanding the parties' failure to call the statute to the attention of the court."). "This rule may be applied to reverse the trial court." Bitzan v. Parisi, 88 Wn.2d 116, 126, 558 P.2d 775 (1977).

A

Aldente contends that it was proper for the trial court to grant summary judgment in its favor. This is so, it asserts, because the "loan transaction upon which this complaint was brought was an exempt transaction under the [CLA]." Specifically, relying on an inapplicable version of the CLA, Aldente contends that its loan was exempt as a transaction with a business or commercial purpose. However, as set forth above, there was no such exception to the CLA licensing requirement at the time of the Aldente loan. Applying the correct version of the

- 12 -

CLA, we hold that summary judgment in Aldente's favor was improperly granted.

As previously explained, the question here is whether Arneson presented sufficient evidence that Aldente was "engage[d] in the business of making [qualifying] loans," including secured or unsecured loans of money. There is evidence in the record that Aldente made at least two secured cash loans during this time, including the loan herein at issue.[7] This evidence supports at least an inference that Aldente was, in fact, in the business of making qualifying loans. Thus, Arneson presented sufficient evidence to create an issue of material fact and summary judgment in Aldente's favor was improper.[8,9]

## B

As with Aldente, Nordlund contends that summary judgment was properly granted in his favor. This is so, he asserts, because the loan was exempt from both the CLA and the usury act because the transaction had a business purpose. We disagree.

As set forth above, at the time the Nordlund loan was made, lenders making loans for business or commercial purposes were exempt from the CLA.

---

[7] The other was made in March 2009. Arneson does not allege any statutory violations arising from that loan transaction.

[8] As a violation of the CLA also constitutes a per se violation of the CPA, RCW 31.04.208, the trial court's dismissal of both the CLA claim and the CPA claim is reversed.

[9] Aldente correctly notes that Arneson's amended complaint did not plead a cause of action against Aldente for violation of the usury act. Furthermore, although Arneson did plead a CPA claim against Aldente, and a violation of the usury act can constitute a violation of the CPA, RCW 19.52.036, Arneson's amended complaint did not assert such a connection. Similarly, nothing in Arneson's pleadings submitted in opposition to Aldente's summary judgment motion contended that Arneson's CPA claim against Aldente was predicated upon a claimed violation of the usury act. Instead, the CLA was the focus of each party's briefing.

Thus, although the parties argue at length in their appellate briefing concerning whether the Aldente loan at issue was (or was not) made for a business purpose, that issue is not properly before us. Although this would be an appropriate inquiry had a usury act violation been alleged, no such allegation was pleaded. Moreover, as we have discussed, an exemption for business or commercial loans was not included in the version of the CLA in effect at the time the challenged Aldente loan was made.

Similarly, loans with a business or commercial purpose were exempt from the usury statute. However, both the CLA and the usury act apply to loans made for primarily personal, family, or household purposes (consumer transactions). Thus, Arneson's CLA and usury act claims against Nordlund[10] converge on a single issue—whether the purpose of the loan was consumer or business. Summary judgment in Nordlund's favor was proper only if there was no genuine dispute as to whether the loan was for a business purpose.

A loan's purpose "is principally established by the representations the borrower makes to the lender at the time the loan is procured." Brown v. Giger, 111 Wn.2d 76, 82, 757 P.2d 523 (1988); accord Jansen v. Nu-West, Inc., 102 Wn. App. 432, 439, 6 P.3d 98 (2000). "The issue is a factual one to be answered after examining the circumstances surrounding the transaction." Castronuevo v. Gen. Acceptance Corp., 79 Wn. App. 747, 751-52, 905 P.2d 387 (1995). "The lender's purpose for the loan, which almost always is a business purpose, is irrelevant." Aetna Fin. Co. v. Darwin, 38 Wn. App. 921, 928, 691 P.2d 581 (1984). "[T]he burden is on the lender to show the business exception applies." Marashi v. Lannen, 55 Wn. App. 820, 823, 780 P.2d 1341 (1989); see also Sparkman & McLean Income Fund v. Wald, 10 Wn. App. 765, 768, 520 P.2d 173 (1974).

"Washington cases consistently have noted the importance of objective indications of purpose in determining the applicability of the 'business purpose' exemption." Brown, 111 Wn.2d at 82. Courts "focus on the purpose the

---

[10] Unlike Aldente, Nordlund does not dispute that both CLA and usury act claims were asserted against him.

borrower actually represented at the time, not what was written on the application." Jansen, 102 Wn. App. at 439-40. "[W]hen other representations of the borrowers are inconclusive, written statements in the loan documents may be dispositive." Marashi, 55 Wn. App. at 824. However, other evidence may contradict the written representations, thus creating a factual question for the trier of fact. Jansen, 102 Wn. App. at 440. A direct conflict in the evidence on the issue of the loan's purpose creates an issue for the trier of fact. Marashi, 55 Wn. App. at 824.

"Determination of the purpose is for the jury, and the question of whether that purpose constitutes a business purpose is a question of law to be decided by the court." Marashi, 55 Wn. App. at 824 n.3. Put differently, while "[a] jury decides the factual question of what the parties understood the funds were going to be spent on," it is for the court to "decide as a matter of law whether the[] proposed expenditures constitute business purposes." Jansen, 102 Wn. App. at 441.

Moreover, the purpose of a given loan transaction is not determined by what type of entity the borrower happens to be. Thus, in Paulman v. Filtercorp, Inc., 127 Wn.2d 387, 899 P.2d 1259 (1995), our Supreme Court treated the purpose of a loan to a for-profit corporate entity as presenting a fact question. The court noted that the consumer loan exemption "represents a calculated legislative decision not to afford the protection of the usury laws to either a corporation or a natural person who borrows money for business purposes." Paulman, 127 Wn.2d at 392. The court's analysis recognizes that non-natural

"persons" may have a personal or consumer purpose in taking out a loan. Thus, it is possible for a trust to do so. Additionally, the fact that entities other than natural persons, by their nature, must engage in loan transactions through representatives does not alter the inquiry. We look to objective indications of the borrower's purpose, as manifested by those acting on the borrower's behalf.

Here, Nordlund presented evidence supporting his assertion that the loan transaction had a business purpose. In particular, he points to the following statement in the promissory note: "Maker represents and warrants to Holder that the sums represented by this Note are being used for business, investment or commercial purposes, and not for personal, family or household purposes." This statement was separately initialed by Arneson and Sweet as co-trustees.

However, Arneson presented evidence to the contrary, supporting her assertion that the loan had a consumer purpose. First, Arneson points to a document entitled "Private Money Term Sheet," which was signed by Nordlund. This document must have been created before the terms of the promissory note were finalized, because it includes a notation to include the business purpose term in the promissory note. The document also includes the following statement indicating that Nordlund was aware of the family court proceedings going on at the time: "Mr. Sweet is allowed to pull $65,000 in cash to him. Mrs. Sweet is required by court order to sign the loan documents or the court will sign for her." Additionally, it includes the following notes regarding how some of the loan proceeds were to be distributed: "Other Items- . . . . Back taxes of approximately $19,900 will be paid from proceeds."

Second, Arneson points to the HUD-I settlement statement, which demonstrates that a portion of the loan proceeds were to be used for consumer purposes. The list of individuals to receive disbursements from the loan proceeds included Sweet's attorneys from the ongoing family law and criminal cases and the family law parenting evaluator. Arneson contends that the settlement statement would have been completed by and present at the loan closing. Additionally, Arneson asserts, Nordlund would have approved these disbursements through escrow instructions. The private money term sheet and the HUD-I settlement statement tend to prove that Nordlund had direct knowledge of the consumer purpose of the loan.

Third, Arneson points to evidence that Nordlund's agent, Mark Flynn,[11] knew of the consumer purpose of the loan. The fact that Flynn made a declaration that was submitted in the family law case leads to an inference that he was aware of the family court's involvement in the loans, including the court's limitations on how the loan proceeds were to be used. As an agent's knowledge is generally imputed to the principal if that knowledge is relevant to the agency relationship, at least for the purpose of Nordlund's summary judgment motion, Flynn's apparent knowledge of the purpose of the loan must be imputed to Nordlund. See Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., 125 Wn. App. 227, 235, 103 P.3d 1256 (2005).

Because the burden of persuasion is ultimately on Nordlund to show that the loan transaction had a business purpose and because there is a fact question

---

[11] Nordlund does not dispute this relationship in his appellate briefing.

as to whether this was the case, summary judgment should not have been granted.

IV

Arneson contends that the trial court erred in concluding that she had no standing to bring claims against Aldente and Nordlund on her own behalf and thus dismissing her individual claims against them. This is so, Arneson asserts, because she was the "true borrower" on both of the loans. We disagree.

It is undisputed that Arneson and Sweet chose to create the Trust during their lifetimes and to use the Trust to hold title to various assets. It is undisputed that third party sellers conveyed the Property directly into the Trust. It is undisputed that, with the approval of the court in their dissolution matter and with the apparent guidance of their legal counsel, the Trust entered into the loan transactions with Aldente and Nordlund. It is undisputed that Arneson and Sweet made the promissory notes to Aldente and Nordlund and supporting deeds of trust solely in their capacities as co-trustees of the Trust. It is undisputed that neither Arneson nor Sweet signed any loan document regarding the Trust's transaction with Nordlund in their individual capacities. It is also undisputed that Arneson and Sweet signed loan documents regarding the Trust's transaction with Aldente in their individual capacities only as guarantors.

Nevertheless, Arneson urges us to conclude that she was the "true borrower" on the loans. Arneson purports to find the "true borrower" concept in McGovern v. Smith, 59 Wn. App. 721, 801 P.2d 250 (1990). In that case, the borrower, Jack McGovern, signed a loan agreement that contained an express

representation and warranty that he would use the loan proceeds "solely for business or commercial purposes." McGovern, 59 Wn. App. at 726. McGovern's aunts, the Marinos, signed a deed of trust securing his loan and, along with McGovern, they signed a promissory note. But the Marinos did not sign the loan agreement. McGovern, 59 Wn. App. at 726-27. After McGovern defaulted on the loan and the lender initiated foreclosure proceedings on the deed of trust, McGovern and the Marinos sought injunctive relief and asserted a claim of usury. McGovern, 59 Wn. App. at 728. The lender responded by arguing that the loan transaction was exempt from the usury statute, as it was for a business or commercial purpose and not for a consumer or household purpose. McGovern, 59 Wn. App. at 729. The court held that the Marinos were not "borrowers" for purposes of determining whether the business exemption from the usury statute applied because "[t]hey were not liable for any cash payments, and [the lender's] sole recourse against the Marinos was to foreclose upon the real estate." McGovern, 59 Wn. App. at 735. Accordingly, the court only looked to McGovern's purpose in determining whether the business exemption from the usury statute applied. McGovern, 59 Wn. App. at 735.

Arneson contends that McGovern stands for one specific and one general proposition relevant to this case. The specific proposition urged is that "one need not sign the note to be [the] actual borrower." Appellant's Br. at 27. However, the facts of McGovern do not sustain this proposition. The actual borrower therein, McGovern, did, in fact, sign the note. Similarly, the actual borrower

herein, the Trust—through its legal representatives, Arneson and Sweet—signed the loan documents.

The general proposition urged is that courts "prefer[] substance over form" when it comes to the usury statute. Appellant's Reply Br. at 12. The implication of the proposition is that, even though Arneson and Sweet made the strategic economic decision to hold certain property in trust, appointed themselves co-trustees of the trust they created, then, as co-trustees, engaged in loan transactions on behalf of the Trust, using trust property as security on the loans, we should hold that Arneson and Sweet—and not the Trust—were the true borrowers on the loans. We will do no such thing. Having made the conscious decision to place the 6708 Tolt Highlands property in trust, Arneson must live with the economic impact of that decision—both when it is of benefit to her and otherwise.

It is clear from both loan agreements that the Trust was the borrower, not Arneson. Thus, the trial court did not err by dismissing Arneson's individual claims based upon her lack of standing.

V

As he does not substantially prevail on appeal, Nordlund's request for an award of attorney fees is denied.[12]

The trial court's orders on summary judgment in favor of Aldente and Nordlund and against the Trust are reversed, as is the judgment entered in favor

---

[12] The parties have not briefed the effect of Nordlund prevailing on appeal against only Arneson. The trial court's award of attorney fees in favor of Nordlund cannot survive today's decision. On remand, the parties may litigate whether Nordlund has any claim for an award of attorney fees as against Arneson individually.

of Nordlund, and the cause is remanded to the trial court for further proceedings consistent with this opinion. The trial court's orders dismissing Arneson's individual claims are affirmed.

Affirmed in part, reversed in part, and remanded.

We concur: